# United States Court of Appeals
## For the First Circuit

No. 18-1248

JAMES HAIDAK,

Plaintiff, Appellant,

v.

UNIVERSITY OF MASSACHUSETTS-AMHERST; ENKU GELAYE, individually
and in her official capacity as Dean of Students and Acting Vice
Chancellor of Student Affairs and Campus Life of the University
of Massachusetts at Amherst; DAVID VAILLANCOURT, individually
and in his official capacity as Senior Associate Dean of
Students of the University of Massachusetts at Amherst; ALLISON
BERGER, individually and in her official capacity as Associate
Dean of Students at University of Massachusetts at Amherst;
PATRICIA CARDOSO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,*
and Selya, Circuit Judge.

Luke Ryan, with whom Sasson, Turnbull, Ryan & Hoose was on
brief, for appellant.
Monica R. Shah and Zalkind Duncan & Bernstein LLP on brief

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

for <u>Foundation for Individual Rights in Education</u>, amicus curiae.

      <u>Denise Barton</u>, Senior Litigation Counsel, with whom <u>Maura Healy</u>, Attorney General, <u>Gerard Leone</u>, Special Assistant Attorney General, General Counsel, and <u>University of Massachusetts, Office of the General Counsel</u>, were on brief, for appellees.

―――――――――――

August 6, 2019

―――――――――――

**KAYATTA**, **Circuit Judge**.  In the wake of allegations that student James Haidak assaulted a fellow student, the University of Massachusetts at Amherst ("the university") suspended and then expelled Haidak.  Seeking compensatory damages, declaratory relief, and an injunction preventing the university from enforcing the expulsion, Haidak filed this suit against the university and several of its officials.  Following discovery, the district court entered summary judgment in the defendants' favor.  Haidak appealed to this court.  For the following reasons, we find that the university violated Haidak's federal constitutional right to due process in suspending him for five months without prior notice or a fair hearing, but that it did not thereafter violate his rights in expelling him after providing a fair expulsion hearing.  We therefore affirm the dismissal of Haidak's complaint in part and otherwise vacate the judgment and remand for further proceedings.

**I.**

**A.**

We begin by describing the student disciplinary process at the university, as specified in the version of the Code of Student Conduct (CSC) in effect during the 2012–2013 academic year.  The CSC enumerated disciplinary and academic violations and described the procedures the university employed to adjudicate suspected violations.  The CSC applied to conduct that occurred both on campus and "in other locations when the behavior distinctly

- 3 -

and directly affect[ed] the University community."  The university could file charges at the request of any student, faculty member, or staff member, or the university could initiate charges itself.

The CSC called for the university to send an accused student a Notice of Charge.  The student then had at least forty-eight hours to request a Disciplinary Conference to discuss the alleged offense.  If the Notice of Charge involved a serious violation, and a university official determined that the accused student was a threat to self, others, or property, the CSC allowed university officials to impose an interim restriction such as a suspension.  Interim restrictions could be imposed without prior notice, although "whenever reasonably possible" a meeting would "be held prior to the imposition of interim restrictions" to inform the student of the "basis of the allegation" and give the student "the opportunity to present his or her own version of the facts." Any violation of an interim restriction could lead to further charges.

The CSC established a Hearing Board, made up of three to five employees and students appointed by the Vice Chancellor for Student Affairs.  The Hearing Board adjudicated contested charges in proceedings in which the university bore the burden of proof by a preponderance of the evidence.  The Hearing Board was not required to "observe the rules of evidence observed by courts, and [could] exclude unduly repetitious or irrelevant evidence."  After

a hearing, the board would create a written summary of testimony, findings of fact, a decision, and a rationale, and then forward this record to the Dean of Students. A designated university official would then render a written decision and sanction. The sanction was informed by, among other factors, the nature of the offense and the student's disciplinary record.

A student could appeal the decision or the sanction to the University Appeals Board. Possible grounds for appeal were: (1) "procedural error or irregularity which materially affected the decision"; (2) "[n]ew evidence not previously available which would have materially affected the decision"; (3) lack of "substantial evidence" supporting the decision; or (4) lack of support for the sanction imposed. The Appeals Board would review the record and make a recommendation to the Vice Chancellor for Student Affairs, who would issue a final decision.

**B.**

Haidak and Lauren Gibney, both university students, were in a tumultuous romantic relationship beginning in 2012. The incident that triggered the initial charges against Haidak occurred in the early morning hours of April 16, 2013, during a semester when Haidak and Gibney were studying abroad in Barcelona. Haidak and Gibney agree that, after the two got home from a club, they got in an argument that turned physical. They dispute who hit whom first. According to Gibney, Haidak put his hands around

her neck, pushed her onto the bed, hurt her by squeezing various pressure points, and grabbed her wrists and punched himself in the face with her fists.  According to Haidak, Gibney struck him, and he only restrained her to prevent her from continuing to hit him, slap him, and kick him in the groin.

Later that day, Gibney's mother called the university to report that Haidak had physically assaulted her daughter.  Gibney followed up three days later by submitting a written report of the incident.  On April 17, Enku Galaye, the Dean of Students, instructed Allison Berger, an Associate Dean of Students, to open a CSC case against Haidak.  On April 19, 2013, Berger issued Haidak a Notice of Charge for violating two provisions of the CSC: (1) Physical Assault[1] and (2) Endangering Behavior to Persons or Property.[2]  The notice included a no-contact order: "You are not to have any direct or indirect contact with [Gibney].  This includes, but is not limited to comments, words or gestures in person, through postal mail, email, text, instant messaging, social networking sites, or by having others . . . act on your

---

[1] The definition of physical assault applied by the Hearing Board without objection was "physical attack upon or physical interference with a person that causes that person to suffer actual physical injury."  Haidak v. Univ. of Mass. at Amherst, 299 F. Supp. 3d 242, 258 n.18 (D. Mass. 2018).

[2] The 2012–2013 CSC prohibited "[e]ndangering the safety of persons (self or others) or property, [and] any action that might lead to loss of life or serious physical harm to others . . . ."

behalf." Haidak met with Berger on May 1, 2013. He denied the allegations and followed up that same day with an email containing his version of the incident.

Despite the no-contact order, Haidak and Gibney resumed contact almost immediately, both over the phone and in person. On May 9, 2013, Gibney's mother discovered hundreds of calls and thousands of text messages from Haidak on the family's phone bill. When Gibney discussed these calls and texts with her mother, and with Berger later that same day, she failed to disclose that the contact had been largely welcomed and reciprocated. On May 28, 2013, Berger issued to Haidak a second Notice of Charge for (1) Harassment[3] and (2) Failure to Comply with the Direction of University Officials.[4] The second notice contained the same explicit directive not to contact Gibney.

On June 3, 2013, Gibney and her mother met with Berger to complain about continued communications from Haidak, and the next day Gibney provided Berger a phone log that chronicled the calls and texts she had received from Haidak: 311 calls and 1,749 text messages between April 24 and June 1. Thirty-one of these

---

[3] Under the CSC, harassment meant "repeated use by one or more students of a written, verbal, or electronic expression or a physical act or gesture, or any combination thereof, directed at a person that places that person to be [sic] in fear for his or her physical safety."

[4] The CSC prohibited "[f]ailure to comply with the directions of University officials acting in performance of their duties."

calls occurred between May 28 and June 1, in violation of the no-contact order contained in the second Notice of Charge.[5] Gibney admitted to Berger that she "did unfortunately get comfortable with talking and therefore would respond some and answer a few calls." It later became clear that Gibney sent approximately seven hundred text messages to Haidak during that six-week period, with many messages after May 28.

The university took no official action between June 4 and June 17. On June 17, Berger issued a third Notice of Charge for (1) Harassment and (2) Failure to Comply with the Direction of University Officials. This time, the university also concluded, without prior notice to Haidak, that Haidak's "behavior represent[ed] a direct and imminent threat to [his] safety and the safety of the University community" and warranted an immediate suspension. The notice informed Haidak that he had the right to a meeting to discuss the suspension.

Two days later, on June 19, Berger conducted a telephonic disciplinary conference with Haidak and his father. They agreed that Haidak would submit a response to the allegations that he had violated the no-contact orders and harassed Gibney and that Berger would then decide whether Haidak should remain suspended pending his hearing for the assault charge.

_____

[5] Haidak maintains that he did not receive the second Notice of Charge until June 1.

- 8 -

During the June 19 call, Haidak also expressed interest in filing charges against Gibney for her violence against him during the Barcelona incident. Berger told Haidak that he was free to file a charge, but that it was unlikely the university would address any charges against Gibney until after the conclusion of the disciplinary process against Haidak.

On July 8, 2013, Haidak sent Berger an email detailing his side of the story and explaining that the communications in violation of the no-contact orders were mutual and welcome. Silence ensued (and the suspension continued) until August 5, 2013, when the university notified Haidak that the interim suspension remained in place pending a hearing on the assault charge, which had yet to be scheduled.

Over the summer of 2013, the university took no action to schedule a hearing for Haidak. In fact, the university had no procedures in place that would have allowed it to conduct a hearing while student board members were away for summer break. Recruitment of new student members began on August 30, 2013, with applications due on September 13 and trainings running through September 27.

On September 1, 2013, Haidak withdrew from the university, concerned that "the lack of a timely Hearing Board date . . . meant that the complaint against him would not be addressed until several weeks into the new school year, at the

earliest."  Haidak v. Univ. of Mass. at Amherst, 299 F. Supp. 3d 242, 255 (D. Mass. 2018).  Haidak got an apartment in Amherst and he and Gibney maintained their off-and-on relationship.

Two incidents that took place in mid- to late-September led Gibney to finally cut off communication with Haidak.  First, on September 14, Haidak -- intoxicated at the time -- called Gibney for a ride.  The two got into an argument, and Haidak threatened to kill himself and then exited the moving car.  Gibney called the police, and her mother reported the incident to Berger the next day.

Gibney and her mother met with Berger on September 19, 2013.  Gibney admitted that she had continued to maintain a relationship with Haidak, but said she no longer wanted contact with him.  Berger "explained that the no contact is in place for both her & James."  It is unclear whether this statement was a reminder that the no-contact order applied to Gibney as well or whether this was the first time Gibney received notice that she was subject to the no-contact order.  According to Berger, the university generally advised the protected party not to engage in contact, but that advice was "very different from a no contact directive as issued in an order or a letter to a student as part of the conduct process."

The second incident took place on September 26. Apparently intoxicated, Haidak arrived at the bar where Gibney

worked.  He positioned himself uncomfortably close to Gibney until security eventually removed him from the premises.  The next day, after notifying the university about the events of the previous night, Gibney sought and obtained a state-court temporary restraining order against Haidak.

On October 8, a state district court held an adversarial hearing to consider Gibney's application to extend the restraining order.  Gibney first testified that she and Haidak broke up in April when they left Barcelona, but then later acknowledged that she and Haidak had been "speaking."  When confronted with text messages she sent to a friend about her relationship with Haidak, Gibney further admitted that she had voluntarily interacted with Haidak after the no-contact order had been issued, including by having consensual sex with him as recently as mid-September.  She also admitted that she had struck and bitten Haidak during the course of their relationship.  The state court declined to extend the restraining order.

The university offered Haidak three dates for the hearing and Haidak selected November 22, 2013.  Haidak knew that he would not be present in Amherst that day and would have to participate by phone.  The university sent Haidak a handout on hearing procedures.  It described a new policy, instituted at the beginning of the 2013-2014 school year, under which charged students could no longer question other students directly, but

instead could submit proposed questions for the Board to consider posing to the witness. Haidak submitted thirty-six questions he wanted the Hearing Board to ask Gibney. Patricia Cardoso, the Assistant Dean of Students, pared this list down to sixteen.

In the weeks preceding the Hearing Board meeting, Haidak and Cardoso also discussed the evidence Haidak wished to present to the Hearing Board. Haidak sent Cardoso a transcript of the state-court restraining order hearing, as well as a photograph of a bite mark Gibney left on his arm in a previous altercation. He also wanted his mother to testify about Gibney's prior acts of violence against him. Cardoso did not permit the introduction of any of these three pieces of evidence.

Four students and one staff chair sat on the Hearing Board that considered Haidak's charges. Gibney attended in person while Haidak phoned in. Haidak's attorney was present, though not allowed to do more than observe the hearing and consult with Haidak by phone. Both Haidak and Gibney had university-appointed advisors present. Moving back and forth between Haidak and Gibney, the Hearing Board ultimately examined each student three times. Of the dozens of questions the Board asked Gibney, none were worded identically to any on Haidak's pre-submitted list, but many were designed to elicit the same information. The Board also examined the photos and statements submitted by each party, as well as text messages and phone logs.

The Board ultimately found Haidak responsible for assault and failure to comply with the no-contact orders, but not for endangerment or harassment. The Board's report provided the following rationale:

> The board finds [Haidak] not responsible for [endangering behavior to persons or property], because his actions did not rise to a level violating this policy. However, his behavior was disproportionate to the actions he attributed to Gibney, and the board believes [Haidak] did cause physical harm to [Gibney's] wrists and arms based on the narratives and pictures presented in the hearing. As such, we find [Haidak] responsible for [physical assault].
>
> Regarding the second and third incidents, the board finds [Haidak] not responsible for [harassment] in both cases, as the contact after the April incident was mutual and non-threatening according to both parties. However, we find [Haidak] responsible for [failure to comply] in both cases because he still knowingly violated the directives of the university, and failed to address any reservations he might have had with the appropriate official.

David Vaillancourt, the Associate Dean of Students, found the outcome "consistent with the charges and based on substantial evidence." After reviewing Haidak's disciplinary history, which included two prior violations of the CSC,[6] Vaillancourt decided on

---

[6] In 2010, Haidak, while intoxicated, assaulted another student and pushed and spat on the resident advisor who broke up the altercation. Haidak was placed in protective custody because of his "level of intoxication," the "anger [he] demonstrated," and his "unwillingness to calm down." He faced CSC violations of endangering behavior, harassment/physical assault, and breach of

- 13 -

expulsion as the appropriate sanction. Haidak appealed to the University Appeals Board, which recommended that the sanction be upheld. Enku Gelaye, the Dean of Students and Acting Vice Chancellor of Student Affairs, upheld the expulsion based on the Appeals Board's recommendation.

Haidak then took the fight to federal court. He filed a two-count complaint against the university and the officials involved. The first count alleged due process and equal protection violations, and the second count asserted a violation of Title IX, 20 U.S.C. § 1681. Both parties moved for summary judgment, and the district court allowed the university's motion and denied Haidak's. Haidak, 299 F. Supp. 3d at 271. Haidak appeals the dismissal of his procedural due process and Title IX claims to this court.

---

university policies. The university ultimately dropped the more serious charges when Haidak agreed to be found responsible for violating university policies. Haidak received the sanctions of housing probation, anger management meetings, and alcohol education workshops.

In 2012, the Amherst Police Department arrested Haidak and charged him with nuisance, noisy and disorderly house, and disturbing the peace. The university charged Haidak with CSC violations of alcohol, endangering behavior, and violations of local, state, or federal law. When Haidak agreed to be found responsible for violating local, state, or federal law, the university dropped the other two charges. Haidak received the sanctions of a reprimand and the writing of a three-page paper on alcohol and student disturbances. Vaillancourt was "disheartened" by Haidak's reflection paper, which said that "[k]ids will party no matter what. End of story . . . . Is this responsible? Certainly not, but it is a simple truth."

We turn first to Haidak's appeal from the district court's dismissal of his procedural due process challenges to his suspension and expulsion. We review de novo a district court's decision on summary judgment, "drawing all reasonable [factual] inferences in favor of the non-moving party." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (quoting Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

It has long been clear that, though states have broad authority to establish and enforce codes of conduct in their educational institutions, they must "recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." Goss v. Lopez, 419 U.S. 565, 574 (1975); see also Gorman v. Univ. of R.I., 837 F.2d 7, 12 (1st Cir. 1988) ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process.").

"Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408

U.S. 471, 481 (1972). To determine what process is constitutionally due, we generally balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see also Gorman, 837 F.2d at 12-16 (applying the Mathews test to determine whether a university's disciplinary proceedings afforded due process).

The principal private and governmental interests at stake in school disciplinary proceedings are reasonably well acknowledged. Students have "paramount" interests "in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma." Gorman, 837 F.2d at 14. The state university, in turn, has an important interest in protecting itself and other students from those whose behavior violates the basic values of the school, Goss, 419 U.S. at 580, 583, and in balancing the need for fair discipline against the need to allocate resources toward "promot[ing] and protect[ing] the primary function of institutions that exist to provide education," Gorman, 837 F.2d at 14. In theory, both parties also share an interest in speed and accuracy in the

- 16 -

adjudication of charges. In this case, all of these interests were implicated. Haidak faced a substantial suspension and complete expulsion, while the university had probable cause to believe that he had used undue physical force on another student and continued to harass her.

"Notice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process." Id. at 12. In the school disciplinary context, the opportunity to be heard requires "some kind of hearing." Goss, 419 U.S. at 579 (emphasis added). Here, we consider the adequacy of two hearings: one in connection with Haidak's suspension and the other in connection with his expulsion. We address each in turn, beginning with the expulsion hearing.

**A.**

The expulsion hearing proceeded in accordance with written procedures given to Haidak in advance. The hearing was limited to charges of which Haidak received timely and detailed notice. Haidak makes no claim that any of the adjudicators was unfit for the job or should have been excluded for cause. Haidak was afforded the rights to be present at the hearing, to hear all evidence against him, to respond directly himself, and to call witnesses. He was also allowed to have an attorney present and to consult with that attorney. The burden of proof was placed on the

charging party to a degree unchallenged by Haidak. The hearing was recorded.

Haidak claims that the hearing was nevertheless constitutionally flawed for two reasons: (1) some of his proffered evidence was excluded; and (2) he was not allowed to cross-examine Gibney. In assessing these claims, we do not ask whether "the hearing mirrored a common law criminal trial," but simply whether Haidak "had an opportunity to answer, explain, and defend." Gorman, 837 F.2d at 14.

**1.**

Haidak argues first that the university unreasonably impeded his opportunity to defend against the charges by excluding certain evidence from the Hearing Board proceedings. Specifically, Haidak challenges the university's refusal to allow him to present: (1) a transcript of the state-court restraining order hearing;[7] and (2) evidence of Gibney's "propensity for violence," consisting of a photograph of the bite mark Gibney left on Haidak's arm in February 2013 and the testimony of Haidak's mother about Gibney's history of physical aggression.

---

[7] Cardoso maintains that, after she pointed out that the transcript included information that would be damaging to Haidak, and that Gibney would admit that some of their contact was consensual, Haidak chose not to put the transcript before the Board. Haidak disputes this account, and for purposes of this appeal, we are required to credit Haidak's version of the facts.

- 18 -

The excluded transcript revealed that, in state court, Gibney first tried to minimize the extent of her welcomed contact with Haidak that took place after the no-contact orders were issued. When pressed, she admitted to additional consensual interactions with Haidak. Had Gibney thereafter successfully convinced the Hearing Board that there was no significant, post-order consensual contact between the two of them, one might well question the exclusion of the transcript. Gibney, though, admitted to the Hearing Board the consensual nature of her post-order contact with Haidak. And as the district court aptly noted, the board acquitted Haidak of the harassment charge. Haidak, 299 F. Supp. 3d at 266. So, Haidak is reduced to arguing that he nevertheless should have been able to use the transcript to show that, because Gibney tried to mislead the state court on what transpired over the summer, she was also trying to mislead the Hearing Board on what transpired in Barcelona.

As we noted earlier, the rules that govern a common law trial need not govern a university disciplinary proceeding. See Gorman, 837 F.2d at 14. But the rules of trial may serve as a useful benchmark to guide our analysis. For example, even in a full-blown federal trial, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). And extrinsic evidence aside, the court has ample

discretion to exclude evidence "if its probative value is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Because a federal district court would have been well within its discretion in excluding the transcript, it follows a fortiori that an identical decision by the Hearing Board did not violate Haidak's right to due process.

Similar reasoning applies to the exclusion of "evidence of [Gibney's] propensity for violence," including the photograph of the bite mark and the testimony by Haidak's mother. Even in a federal criminal trial, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). An exception to this general rule allows a defendant in a criminal case to "offer evidence of an alleged victim's pertinent trait," such as physical aggressiveness. Fed. R. Evid. 404(a)(2). However, such evidence may only be introduced in the form of testimony about the alleged victim's reputation or by testimony in the form of an opinion. Fed. R. Evid. 405(a). Testimony by Haidak's mother that Gibney had previously struck Haidak would have exceeded this narrow exception. And in any event, the evidence was redundant. Haidak testified -- and Gibney did not dispute -- that "a lot of these instances occurred, these sort of instances where she would become

violent when she was drunk." There was nothing unfair -- much less constitutionally unfair -- about the Board's decision to keep its focus on the events at issue.

**2.**

Next, Haidak argues that the Hearing Board violated his right to procedural due process by failing to accord him the opportunity to interrogate Gibney directly. In Gorman v. University of Rhode Island, a student challenged the constitutionality of university disciplinary proceedings that resulted in his suspension. 837 F.2d at 9. Among other things, Gorman contended that the university deprived him of a constitutional right to cross-examine members of the university Hearing Board on his allegations of bias. Id. at 16. We concluded that the University of Rhode Island did not violate Gorman's procedural due process rights, noting that "the right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases." Id. (emphasis added). Haidak urges us to hold that, while unlimited cross-examination may not be required, due process demands that the accused be allowed to question opposing witnesses directly whenever a university disciplinary proceeding turns on the witnesses' credibility.

In adjudicating Haidak's case, the university employed a non-adversarial model of truth seeking. It was the university's

responsibility, rather than the parties', to investigate the facts and develop the arguments for and against a finding of responsibility. Neither party made opening or closing arguments to the board. Though both parties submitted written statements of fact, neither submitted brief-like materials that argued for or against a finding of responsibility. Neither party questioned witnesses.

Such a system of adjudication can fairly be called inquisitorial. See Inquisitorial System, Black's Law Dictionary (11th ed. 2019) (defining "inquisitorial system" as a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry"). No doubt, this model of justice is not the one our founders chose for criminal trials. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."); see also Crawford v. Washington, 541 U.S. 36, 61 (2004) (The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."). But this is not to say that the inquisitorial model is constitutionally inadequate in all settings. In fact, we consider the inquisitorial model fair enough for critical administrative decisions like whether to award or terminate disability benefits. See Sims v.

- 22 -

_Apfel_, 530 U.S. 103, 110–11 (2000) (explaining that Social Security proceedings are inquisitorial rather than adversarial).

We are aware of no data proving which form of inquiry produces the more accurate result in the school disciplinary setting. Considerable anecdotal experience suggests that cross-examination in the hands of an experienced trial lawyer is an effective tool. See _California_ v. _Green_, 399 U.S. 149, 158 (1970) (noting that cross-examination is "the greatest legal engine ever invented for the discovery of truth" (internal quotation marks omitted)). One must keep in mind, however, that courts generally find that an accused student has no right to legal counsel in school disciplinary proceedings. See _Gorman_ 837 F.2d at 16. Nor does Haidak assert such a right in this case. So, his position would seem to be that the accused student must be allowed to question opposing witnesses himself.

As a general rule, we disagree, primarily because we doubt that student-conducted cross-examination would so increase the probative value of hearings and decrease the "risk of erroneous deprivation," _Mathews_, 424 U.S. at 335, that it is constitutionally required in this setting. In the hands of a relative tyro, cross-examination can devolve into more of a debate. And when the questioner and witness are the accused and the accuser, schools may reasonably fear that student-conducted cross-examination will lead to displays of acrimony or worse.

- 23 -

This is not to say that a university can fairly adjudicate a serious disciplinary charge without any mechanism for confronting the complaining witness and probing his or her account. Rather, we are simply not convinced that the person doing the confronting must be the accused student or that student's representative. In this respect, we agree with a position taken by the Foundation for Individual Rights in Education, as amicus in support of the appellant -- that due process in the university disciplinary setting requires "some opportunity for real-time cross-examination, even if only through a hearing panel."

Arguing that due process requires more than inquisition of the complaining witness by the factfinder alone, Haidak points to the Sixth Circuit's decision in Doe v. Baum, 903 F.3d 575 (6th Cir. 2018). In that case, a female student alleged that a male student had sex with her while she was so drunk that she could not consent. Id. at 579. The accused claimed that his accuser did not appear drunk and in fact expressly consented. Id. A school investigator found the competing versions in equipoise. Id. at 580. A university board then ruled against the accused student, with no testimonial hearing at all, because "Roe's description of events was 'more credible' than Doe's, and Roe's witnesses were more persuasive." Id. In a holding that we could easily join, the court found the complete absence of any examination before the factfinder to be procedurally deficient. Id. at 581. But the

court took the conclusion one step further than we care to go, announcing a categorical rule that the state school had to provide for cross-examination by the accused or his representative in all cases turning on credibility determinations.  Id.

We stop short of adopting that latter pronouncement because we have no reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation.  We also take seriously the admonition that student disciplinary proceedings need not mirror common law trials.  See Goss, 419 U.S. at 583 ("To impose . . . even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness."); Gorman, 837 F.2d at 16 ("A major purpose of the administrative process, and the administrative hearing, is to avoid the formalistic adversary mode of procedure.").  If we were to insist on a right to party-conducted cross-examination, it would be a short slide to insist on the participation of counsel able to conduct such examination, and at that point the mandated mimicry of a jury-waived trial would be near complete.

That still leaves us with the question of whether, in this case, the university's inquisitorial approach to ferreting out the truth was so inadequate that it violated Haidak's

procedural due process rights.  When a school reserves to itself the right to examine the witnesses, it also assumes for itself the responsibility to conduct reasonably adequate questioning.  A school cannot both tell the student to forgo direct inquiry and then fail to reasonably probe the testimony tendered against that student.

Whether the university in this case fulfilled that responsibility is a close question.  The university's manual for its Hearing Board implied that the Board should choose student comfort at the expense of serious examination.  It called for the Board to start by calming the student with "easy" questions, to avoid leading questions, and to beware of the "danger of pursuing a line of questions" because "it can be very adversarial." Efforts of this type to put a witness "at ease," when applied only to a complaining witness, helped render potentially unfair the proceedings in another recent case we decided.  See Trs. of Bos. Coll., 892 F.3d at 87.  Here, though, at least the manual advised the Board to use this ill-suited kid-gloves approach for witnesses on both sides of the dispute.

Even more concerning, when Haidak proposed a list of thirty-six questions that he wanted the Board to ask Gibney, Cardoso struck twenty questions from the list before submitting it to the Hearing Board, thereby preventing the Board from knowing Haidak's proposed questions and deciding whether to ask them as it

saw the testimony play out.  In this manner, the university created the possibility that nobody would effectively confront Gibney's accusations.

As it turned out, the members of the Board nevertheless managed to avoid the pitfalls created by the university.  The Board questioned Gibney at length on the matters central to the charges. It probed for detail[8] and required her to clarify ambiguities in her responses.[9]  It inquired into her level of intoxication, asking for an estimate of the number of drinks she had consumed and if it was true that she had fallen down earlier in the night.  By alternating between questioning Haidak and Gibney, ultimately examining each student three times, it engaged in an iterative process in which its questioning of Gibney was informed in real time by Haidak's testimony as the proceedings unfolded.  In so doing, it extracted Gibney's admission that she continued a

---

[8] For example, observing that Gibney's description of the incident "went a little fast," the Board asked, "Would you mind restating . . . how you got from the main room where you were arguing to the bedroom?  Did you go there of your own accord?  Were you pushed or pulled?  You said he took you by the neck to there, but could you be more specific?".

[9] For example, a Board member asked whether Gibney and Haidak "[had] any contact that could be considered like a romantic relationship as a continuation from [their] prior relationship during the time when the no contact order was in place."  When Gibney answered with a simple "yes," the Board member asked her to "explain what you mean by yes."  In response, Gibney stated, "[w]hen he came to Amherst we did have romantic, physical contact."

"romantic" relationship with Haidak after Barcelona and during the period covered by the no-contact orders.

In arguing that the Board's questioning of Gibney was nevertheless constitutionally inadequate, Haidak points to four areas of inquiry that he claims the Board improperly failed to pursue. For two of these -- Gibney's "propensity for violence" and her "untruthfulness at the restraining order proceeding" -- we rest on our discussion above. As to the third area of inquiry, "the post-Barcelona steps [Gibney] took to conceal her relationship with Haidak from her parents" and "whether [Gibney] lied to her friends about resuming contact with Haidak," we fail to see much, if any, probative value in such inquiries. Gibney conceded that she and Haidak had consensual contact, including physical contact, while the no-contact orders were in place. The Board also absolved Haidak of the harassment charge, and Gibney's desire to hide the ongoing relationship from her parents and friends seems irrelevant to whether Haidak's use of force was justified. Finally, Haidak takes issue with the Board's decision not to inquire into whether Gibney "blamed her parents for the disciplinary proceedings" or "expressed a desire that all charges be 'dropped.'" But it is unclear what relevance Gibney's feelings about the disciplinary process have to whether Haidak's use of force in Barcelona was disproportionate.

The Board's ultimate findings also reflect that its probing exposed weaknesses in the charges against Haidak. The Board decided that Haidak was not responsible for Endangering Behavior, the most serious charge he faced, because "his actions did not rise to a level violating this policy." It similarly found him not responsible for either harassment charge because "the contact after the April incident was mutual and non-threatening." It found Haidak responsible for violating the no-contact orders, which he admitted, and assault, but only because "his behavior was disproportionate to the actions he attributed" to Gibney. This finding seems reasonable, and was very likely the product of a judgment about the credibility of the two protagonists, the bruises on Gibney's wrists, and the undisputed fact that she immediately reported to her mother that Haidak had assaulted her. Moreover, Gibney testified in person, while Haidak chose to appear by phone, a decision that possibly created a greater disadvantage than that posed by any of the challenged procedures.

All in all, the Board managed to conduct a hearing reasonably calculated to get to the truth by allowing Haidak to be heard after Gibney testified and by examining Gibney in a manner reasonably calculated to expose any relevant flaws in her claims. We therefore disagree with Haidak that the expulsion hearing did not provide due process.

We turn next to the process surrounding Haidak's suspension pending the expulsion hearing. To recap, on June 3 and 4, Gibney and her mother presented Berger with evidence that Haidak had called Gibney thirty-one times after the May 28 no-contact order was issued. Thirteen days later, and without prior notice, Berger suspended Haidak indefinitely. Two days after that, Berger spoke on the phone with Haidak and his father and agreed to review Haidak's written response to the charges. As best the record reflects, Berger did not thereafter confront Gibney with those responses, instead letting the suspension stand. Because the university failed to schedule an expulsion hearing before November, the suspension lasted five months.

While it lasts, a suspension more or less deprives a student of all the benefits of being enrolled at a university. The Supreme Court has held that a deprivation of this sort requires notice and a hearing. See Goss 419 U.S. at 579 ("At the very minimum . . . students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."). What type of notice and what type of hearing turn on the interests implicated in each particular case. See Doe v. Univ. of Cincinnati, 872 F.3d 393, 400 (6th Cir. 2017) ("The more serious the deprivation, the more demanding the process.").

As a general rule, both notice and a hearing should precede a suspension. Goss, 419 U.S. at 582; Gorman, 837 F.2d at 12-13. On occasion, though, exigencies may properly provide an exception to this general rule: "Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . ." Goss, 419 U.S. at 582–83; see also Elena v. Mun. of San Juan, 677 F.3d 1, 9 (1st Cir. 2012) ("Although prior notice is generally required for a governmental deprivation of property to comport with procedural due process, the Supreme Court has held that there is an exception for cases 'where a State must act quickly, or where it would be impractical to provide predeprivation process.'" (quoting Gilbert v. Homar, 520 U.S. 924, 930 (1997))).

Here, however, the record belies any claim of exigency. The university waited thirteen days after learning about the continued contact to issue the suspension order. And the university offers no evidence suggesting that it was infeasible to provide some type of process during the available thirteen days before it imposed a suspension.

The university did allow Haidak to respond to the charges both orally and in writing fifteen days after Gibney complained and two days after the suspension took effect. Given the apparent

absence of any perceived exigency, that process came too late to serve as an opportunity to be heard <u>before</u> the suspension began. And it was, in any event, insufficient to provide, by itself, due process in connection with a five-month suspension that ran through most of a semester. Importantly, the university knew that on the key issue justifying a lengthy suspension -- whether the continued communication represented a threat to the university community -- Haidak directly disputed Gibney's account in a manner that could be verified. The university could easily have confronted Gibney with the information provided by Haidak, and even a rudimentary hearing would have revealed that Haidak's contact with Gibney was welcomed and reciprocated. When a state university faces no real exigency and certainly when it seeks to continue a suspension for a lengthy period, due process requires "something more than an informal interview with an administrative authority of the college." <u>Gorman</u>, 837 F.2d at 14 (quoting <u>Dixon</u> v. <u>Ala. State Bd. of Educ.</u>, 294 F.2d 150, 158 (5th Cir. 1961)). But "an informal interview" is all Haidak received.

Certainly, a university may proceed in stages. A university can first ask a student to respond to the charge. And if the response offers no plausible defense, then the need for further inquiry diminishes, much like the manner in which a guilty plea eliminates the need for further proceedings. But when the response leaves the matter turning on credibility, the interests

at stake are as substantial as those implicated by an extended suspension, and no perceived exigency exists, a university must do more than presume one version to be correct.

The university does argue that, given Gibney's accusations and Haidak's response, it had no need to conduct a more robust hearing. The university points to Haidak's admission that he had repeatedly contacted Gibney even after the no-contact orders took effect. But, had university officials conducted a more substantial hearing before suspending Haidak, they would likely have discovered that they misunderstood the nature of the contact between him and Gibney. And as university counsel forthrightly conceded at oral argument, the record does not compel a finding that the university would have suspended Haidak had it known that the communications were welcomed and reciprocated by Gibney. After all, the Board ultimately concluded that the contact between Haidak and Gibney was "non-threatening," undermining the university's contention that the illicit contact was a threat that warranted immediate suspension. In sum, the suspension decision was not a slam dunk, and there was ample time to provide prior notice and a meaningful opportunity to be heard. On such a record, the university violated Haidak's due process rights.

It is true, as the university argues, that the failure to provide a pre-suspension hearing ultimately caused no actual injury, because the final penalty of expulsion was imposed in

accordance with due process.  But the Supreme Court has ruled that a violation of procedural due process rights, even in the absence of actual injury, justifies a finding in favor of the student and an award of nominal damages.  See Carey v. Piphus, 435 U.S. 247, 266 (1978); see also Farrar v. Hobby, 506 U.S. 103, 112 (1992) ("Carey obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury."); Ford v. Bender, 768 F.3d 15, 24 (1st Cir. 2014) ("The merits of the deprivation itself are immaterial to the procedural due process analysis.").[10]

## c.

Haidak also tries to advance an argument that the delay in convening his expulsion hearing was itself a violation of due process.  To a large extent, this argument is simply the flipside of the argument that we have already accepted, i.e., that he should not have been suspended for so long without a hearing.  Haidak also seems to suggest that the delay independently harmed him because the version of the university's hearing procedures in effect prior to the fall of 2013 allowed for student-conducted cross-examination.  But Haidak develops no argument that due process requires the application of whatever procedural rules were in effect at the time of the offense or charge, so we deem any

_____

[10] We need not consider prior to remand how the district court should handle a motion for fees should one be filed.

such argument waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**III.**

Finally, Haidak challenges the district court's summary judgment dismissal of his Title IX claim.  Title IX prohibits federally funded universities from discriminating against students on the basis of sex.  20 U.S.C. § 1681(a).  Below, Haidak pursued both "erroneous outcome" and "selective enforcement" theories of liability.  See Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994) (explaining that attacks against a university disciplinary proceeding on grounds of gender bias generally fall within these two categories).[11]  On appeal, Haidak presses only the selective enforcement theory.  To succeed on such a claim, Haidak must show that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Id. at 715.

---

[11] Both parties agree on the theories of liability outlined in Yusuf.  We have, in the past, applied the Yusuf framework to Title IX challenges based on disciplinary proceedings, though we have held off on deciding whether, as in the Second Circuit, "the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well."  Trs. of Bos. Coll., 892 F.3d at 90 n.13 (quoting Doe v. Columbia Univ., 831 F.3d 46, 56 (2d Cir. 2016)).

Haidak alleges that both the decision to initiate charges and the penalty imposed were affected by his sex.

Haidak's claim that the decision to initiate charges was affected by his sex rests on the fact that the university filed charges against him when Gibney accused him of misconduct, yet filed no charges against her when he accused her of misconduct. But the two were not similarly situated as complainants. Gibney and her mother affirmatively contacted the university to report her charges and to seek relief. A reasonable administrator would have construed that contact as a request to pursue the matter so as to be able to provide relief. Haidak's accusations came second in time and arose only defensively. And when expressly told that he could initiate a charge under the CSC, he demurred.

As the university concedes, it still could have initiated a charge against Gibney on its own initiative. The CSC provided that the university could file appropriate charges against a student "[a]t the request of any student, faculty or staff member or independently." But we see no basis in the CSC or in the record for concluding that the university always had to initiate a charge even when the student declined an invitation to do so.

More importantly, showing that the university had an "unwritten, race-to-the-dean's-office policy," as Haidak alleges, is not enough to support an inference of discrimination on the

basis of sex. To make out a claim under Title IX, Haidak must show that "gender bias was a motivating factor" in the disciplinary process. Trs. of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) (quoting Yusuf, 35 F.3d at 715). At most, Haidak has alleged that the university pursued Gibney's case instead of his because Gibney made the allegation first -- not because Haidak's sex influenced the university.

We turn next to Haidak's argument that the testimony of his expert witness justifies a trial on his claim that he was penalized more severely on account of his sex. Haidak's expert analyzed university data regarding assault charges occurring between 2010 and 2015. The data set included the sex of the complaining and charged students, the charges, whether there was a finding of responsibility, and what sanction followed. It did not include the students' disciplinary records or any information about the charged conduct, including whether injuries resulted. The data revealed that ninety-three male students and twenty-six female students were found responsible for assault, and of these, thirteen students were expelled, all of whom were male.

We have never recognized a private right of action for disparate-impact discrimination under Title IX. See Alexander v. Sandoval, 532 U.S. 275, 283 (2001) (holding that there is no private right of action for disparate-impact discrimination under the similarly worded Title VI); see also Cannon v. Univ. of

Chicago, 441 U.S. 677, 694–95 (1979) (noting that Congress patterned Title IX after Title VI and intended to create the same remedies under both statutes). Haidak, though, correctly argues that proper evidence of a statistical disparity may generate an inference of intentional discrimination. Cohen v. Brown Univ., 101 F.3d 155, 170–71 (1st Cir. 1996) ("Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination.").

For a statistical disparity to support an inference of sex discrimination, the evidence must "tend to show that there was a causal connection between the outcome of [the] disciplinary proceedings and gender bias." Trs. of Bos. Coll., 892 F.3d at 91. Here, although the data show that male students were more often accused of and more often expelled for assault, the data fail to address an array of alternative explanations. These trends could reflect, for example, that male students on average had lengthier disciplinary histories or committed more serious assaults, or that assaults committed by women were reported less often, rather than that the university discriminated against male students. Haidak's expert acknowledged these weaknesses, stating in his deposition, "I'm not saying that there is proof here of discrimination, or even bias in sort of a colloquial sense."

Haidak half-heartedly counters that the district court prevented him from obtaining the kind of detailed data that would have allowed his expert to draw more robust conclusions. But Haidak's brief presses no appeal to the discovery orders that limited the data available to his expert and instead asserts that "the statistical universe upon which [the expert] relied was complete and highly relevant."

Even if the foregoing weaknesses might not preclude the use of the expert's analysis in a disparate-impact case -- an issue we need not decide -- its relevance in proving intentional discrimination is further undercut by the absence of any evidence that the person who selected Haidak's penalty, Vaillancourt, was also the person who selected the penalties in the assault cases examined by Haidak's expert. Even if one could infer from the data that another decision maker issued higher penalties based on sex, that inference says little about whether the decision maker in this case brought to bear any bias on the basis of sex.

The university also provided a convincing, sex-neutral explanation for the sanction of expulsion:

> Despite the [two] earlier attempts by the University to redirect [Haidak's] decision-making and behavior, he had not altered his behavior. Further, in light of his flagrant violation of the university's [two] no contact orders, it was clear he would not comply with any future directives from the university to ensure the safety of himself, [Gibney], or others.

In light of this highly plausible explanation, and the weakness of the statistical evidence, we agree with the district court that no reasonable jury could infer from the expert's report that the decision to expel Haidak was motivated by his sex in violation of Title IX.

**IV.**

The university argues that, should we find that the district court erred, in whole or in part, in granting its motion for summary judgment, we should dismiss the claims for monetary relief against the university officials as barred by sovereign immunity under the Eleventh Amendment. Haidak concedes that sovereign immunity bars his claims for monetary damages against the university officials acting in their official capacities, but notes that he also sued the university officials in their individual capacities. The Eleventh Amendment does not bar suits for damages against state officials sued in their individual capacities, though such officials are usually protected by common law immunity. See Hafer v. Melo, 502 U.S. 21, 26 (1991). We therefore affirm on alternate grounds the dismissal of the section 1983 claims for damages, but only against the university employees acting in their official capacities.

In the alternative, the university argues that -- even if sovereign immunity does not bar the claims against the officials

in their individual capacities -- the university officials are protected by qualified immunity.  However, the university failed to invoke qualified immunity below, and this defense is therefore waived.  See Guzmán-Rivera v. Rivera-Cruz, 98 F.3d 664, 667 (1st Cir. 1996) ("Since immunity must be affirmatively pleaded, it follows that failure to do so can work a waiver of the defense." (quoting Kennedy v. City of Cleveland, 797 F.2d 297, 300 (6th Cir. 1986))).

## V.

For the foregoing reasons, we affirm the district court's dismissal of Haidak's section 1983 claims challenging the constitutional adequacy of his expulsion hearing; we affirm on alternate grounds the district court's dismissal of his section 1983 claims for money damages against the university officials acting in their official capacities; and we affirm the dismissal of his Title IX claim; but we vacate for the entry of nominal monetary damages the dismissal of Haidak's section 1983 claims challenging the constitutionality of the manner in which the university suspended him for five months without prior notice or an adequate hearing.  We remand for further proceedings consistent with this opinion.  No costs are awarded to either party.