FILED
United States Court of Appeals
Tenth Circuit

March 9, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

JOHN DOE,

     Plaintiff - Appellant,

v.

UNIVERSITY OF DENVER;
UNIVERSITY OF DENVER BOARD OF
TRUSTEES; REBECCA CHOPP,
individually and as agent for University of
Denver; KRISTIN OLSON, individually
and as agent for University of Denver;
JEAN MCALLISTER, individually and as
agent for University of Denver;
KATHRYNE GROVE, individually and as
agent for University of Denver; ERIC
BUTLER, individually and as agent for
University of Denver,

     Defendants - Appellees.

No. 18-1162

———————————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:16-CV-00152-PAB-STV)**
———————————————————

Philip A. Byler of Nesenoff & Miltenberg, LLP, New York, New York (Andrew T.
Miltenberg, Stuart Bernstein, Tara J. Davis, and Jeffrey Berkowitz of Nesenoff &
Miltenberg, LLP, New York, New York, and Michael J. Mirabella and Patricia Mellen of
Michael J. Mirabella, P.C., Denver, Colorado, with him on the briefs), for Plaintiff -
Appellant.

Jim Goh (E. Rayner Mangum with him on the brief), Constangy, Brooks, Smith &
Prophete, LLP, Denver, Colorado, for Defendants - Appellees.
———————————————————

Before **BACHARACH**, **McKAY**, and **CARSON**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

This appeal involves the fairness of sexual-misconduct disciplinary proceedings at colleges and universities. In the district court, Plaintiff John Doe asserted that the disciplinary proceeding brought against him by Defendants, the University of Denver ("DU") along with several of its employees, violated his rights under the Fourteenth Amendment's Due Process Clause and under Title IX. The court granted summary judgment to Defendants on the Fourteenth Amendment claim because Plaintiff had failed to show that DU was a state actor. The court also granted Defendants summary judgment on the Title IX claim, concluding that Plaintiff had adduced insufficient evidence of gender bias.[1]

## I. Fourteenth Amendment Due Process Claim

We turn first to Plaintiff's due process claim. DU is a private school, and thus its actions are not normally subject to constitutional due process requirements. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("[S]tate action [is] subject to Fourteenth Amendment scrutiny[,] and private conduct (however exceptionable) . . . is not."); *Browns v. Mitchell*, 409 F.2d 593, 594 (10th

---

[1] Plaintiff's complaint also asserted several state-law claims and sought declaratory relief. After disposing of the substantive federal-law claims, the court declined to retain jurisdiction over the state-law claims, dismissed them and the request for declaratory relief without prejudice, and closed the case.

Cir. 1969) ("It is axiomatic that the due process provisions of the Fourteenth Amendment proscribe state action only and do not reach acts of private persons unless they are acting under color of state law." (internal quotation marks omitted)). As Plaintiff's briefing suggests, his claim is cognizable only if DU may be deemed a state actor for purposes of constitutional due process. *See Brentwood Acad.*, 531 U.S. at 296 (outlining tests used to determine whether state action should be attributed to nominally private entities). Thus, at summary judgment, Plaintiff had the burden to produce evidence demonstrating that DU should be deemed a state actor. *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1450, 1455–56 (10th Cir. 1995) (affirming summary judgment in favor of defendants in part because plaintiffs failed to produce evidence to satisfy state-action tests).

There are two constitutional sources of due process rights, the Fifth Amendment and the Fourteenth Amendment. Plaintiffs pursuing procedural due process claims based on actions by the federal government must proceed under the Fifth Amendment, while plaintiffs bringing such claims based on actions by state governments must proceed under the Fourteenth Amendment. *See Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 748 n.2 (10th Cir. 2013).

Plaintiff has eschewed any reliance on the Fifth Amendment. Plaintiff expressly relied only on the Fourteenth Amendment in his complaint and district court briefing, and he continues to do so on appeal even in the face of both the district court's suggestion and DU's assertion that the Fourteenth Amendment is

3

inapposite for a due process claim based exclusively on the federal government's activities.  (*See* Appellant's Opening Br. at 53–54 (arguing that, although the district court suggested "federal government activity is irrelevant to the 14th Amendment[,] . . . the 14th Amendment . . . appl[ies]").)  Plaintiff is the master of his complaint.  *See Bledsoe v. Vanderbilt*, 934 F.3d 1112, 1119 (10th Cir. 2019).  We are satisfied that Plaintiff intended to bring this claim under the Fourteenth Amendment, and that is how we will assess it.  *See In re Storer*, 58 F.3d 1125, 1129 & n.6 (6th Cir. 1995) (declining to assess claims under Fourteenth Amendment Due Process Clause where plaintiffs clearly intended to rely only on Fifth Amendment Due Process Clause).[2]

---

[2] Plaintiffs might fail to reference the correct constitutional amendment through mere inadvertence.  Or, they might do so simply because they mistakenly believe they need only show that a defendant's actions should be attributed to government in the generic sense, without distinguishing between federal and state government.  So, we have sometimes winked at a plaintiff's reliance on the incorrect amendment as an inconsequential mistake when the error appears to be the product of inadvertence and where the distinction would be immaterial to the analysis, *see Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007); *see also Greene v. Impson*, 530 F. App'x 777, 779 n.3 (10th Cir. 2013); *Sawyer v. Burke*, 504 F. App'x 671, 673–74 (10th Cir. 2012), and district courts within this circuit have done the same, *see Sigg v. Dist. Ct.*, No. 06-2436-KHV, 2007 WL 913926, at *5 n.9 (D. Kan. Mar. 23, 2007); *Thunder v. Gunja*, No. Civ.A03CV01575REBOES, 2005 WL 2141068, at *9 (D. Colo. Aug. 11, 2005), *adopted by* 2005 WL 2372816 (D. Colo. Sept. 27, 2005).  Other courts of appeal have done so as well.  *See Kell v. Smith*, 743 F. App'x 292, 295–96 (11th Cir. 2018); *Martial-Emanuel v. Holder*, 523 F. App'x 345, 349 n.1 (6th Cir. 2013); *Collins v. Univ. of N.H.*, 664 F.3d 8, 12 n.1 (1st Cir. 2011); *High v. Angelone*, 168 F.3d 499 (table), 1999 WL 97353, at *3 (9th Cir. 1999); *Bieregu v. Reno*, 59 F.3d 1445, 1454 (3d Cir. 1995), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996), *as recognized by Oliver v. Fauver*, 118 F.3d 175, 178 (3d Cir. 1997); *United States v. Couch*, 896 F.2d 78, 79–83 & n.2 (5th Cir. 1990).  And, of course, excusing a mistaken reference to the wrong amendment is especially appropriate when, unlike here, the plaintiff is proceeding pro se and cannot be

4

In support of his claim that DU was a state actor, Plaintiff relied solely on evidence of the federal government's involvement in DU's affairs. Specifically, Plaintiff pointed to (1) DU's compliance with guidance from the Department of Education's Office for Civil Rights regarding Title IX's requirements that was contained in a 2011 Dear Colleague Letter ("DCL"),[3] which, Plaintiff asserts, pressured DU to amend its policies in ways that were biased against male students accused of sexual misconduct; and (2) the threatened loss of federal funding if DU failed to conform to the DCL's guidance. We have previously held, however, that evidence regarding the *federal* government's involvement with a private school or its decision to discipline students has no bearing on whether the school is a state actor under the Fourteenth Amendment, which is concerned only with the actions of *state*

---

expected to identify the specific legal source of his claim with the precision of a trained lawyer. *See Firstenberg v. City of Santa Fe*, 696 F.3d 1018, 1024 (10th Cir. 2012). However, the error might also be the result of a calculated decision. For instance, plaintiffs might avoid reliance on the Fifth Amendment due to the limitations on such claims. *See generally Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 858–64 (10th Cir. 2016); *Peoples v. CCA Detentions Ctrs.*, 422 F.3d 1090, 1096–1108 (10th Cir. 2005).

Here, we cannot construe Plaintiff's claim as if brought under the Fifth Amendment. Plaintiff is represented by capable attorneys, and his choice to eschew reliance on the Fifth Amendment cannot be chalked up to mere inadvertence.

[3] As explained below, the DCL "ushered in a more rigorous approach to campus sexual misconduct allegations" by providing guidance that encouraged schools to take tougher stances on students accused of sexual misconduct. *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019). By informing schools that funding depended on compliance with OCR's guidance, the DCL was viewed as pressuring schools to adhere to its guidance or else lose federal funding. *See id.* at 668–69.

governments.  *See Browns*, 409 F.2d at 595 ("Inasmuch as . . . 42 U.S.C. § 1983[4] is concerned only with state action and does not concern itself with federal action[,] we lay to one side as entirely irrelevant any evidence concerning the participation of the federal government in the affairs of the University.  And so it is state action with which we are here concerned and more particularly . . . whether the State of Colorado . . . [should be viewed as involved in] the challenged disciplinary proceeding." (citation and quotation marks omitted)).[5]  Thus, Plaintiff failed to adduce any relevant evidence to show that DU is a state actor for purposes of his Fourteenth Amendment claim.

In sum, although we agree with the district court that Plaintiff failed to demonstrate that DU was a state actor for purposes of his Fourteenth Amendment due process claim, we reach this conclusion on somewhat different grounds, namely that Plaintiff failed to adduce any evidence of a *state's* involvement in the disciplinary proceeding he challenges.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2014) ("[W]e may affirm on any basis supported by the record . . . .").

---

[4] For purposes of determining whether a private entity may be held liable as a state actor, the state-action requirement of the Fourteenth Amendment and the under-color-of-state-law requirement of § 1983 are identical.  *See Neil Young Freedom Concert*, 49 F.3d at 1446–47.

[5] Other circuits have readily employed this same principle without hesitation. *See Musso v. Suriano*, 586 F.2d 59, 61 n.4 (7th Cir. 1978); *Berrios v. Int'l Am. Univ.*, 535 F.2d 1330, 1332 n.5 (1st Cir. 1976); *Weise v. Syracuse Univ.*, 522 F.2d 397, 404 (2d Cir. 1975); *Blackburn v. Fisk Univ.*, 443 F.2d 121, 123 (6th Cir. 1971).

Accordingly, we will affirm the court's decision to grant Defendants summary judgment on the due process claim.

## II.    Title IX Claim

We now turn to Plaintiff's Title IX claim, which requires some background. Plaintiff is a male who enrolled as a freshman at DU in 2014. In October 2014, Plaintiff had a sexual encounter with Jane Doe, a female freshman, in his dorm room. Six months later, in April 2015, Jane's boyfriend reported the encounter as an alleged sexual assault to a DU resident director. The resident director then spoke with Jane, who repeated the allegations and later filed with DU's Office of Equal Opportunity a complaint of non-consensual sexual contact.

Under DU's policies, a student's non-consensual sexual contact with another is a policy violation. Prohibited sexual contact includes contact by "coercion," which the policy defines as "unreasonable and persistent pressure to compel another individual to initiate or continue sexual activity against an individual's will," such as "continued pressure" after "someone makes clear that they do not want to engage in sexual contact." (Appellant's App. at A139.)

Two of the named Defendants, Kathryne Grove, OEO's director, and Eric Butler, an OEO investigator, investigated Jane's allegations. The investigators separately interviewed Plaintiff and Jane twice in May and June 2015, allowing each of them to offer corrections to their own summary statements, which the investigators had drafted for them based on their respective interviews, and allowing Plaintiff to

7

submit a list of witnesses for the investigators to interview. The investigators also interviewed other witnesses—Plaintiff's roommate, a mutual acquaintance who was present in the dorm room before the encounter took place, Jane's boyfriend, and the resident director who first received the allegations. In late June, the investigators issued a preliminary report to Plaintiff and Jane, allowing them to offer any further corrections to their own statements. The preliminary report, which did not make any findings or conclusions, offered Plaintiff the first opportunity to see Jane's allegations against him.

In mid-July 2015, the investigators issued their final report, which depicted a he-said-she-said situation. After summarizing witness interviews, the investigators "f[ound] it more likely than not that [Plaintiff]'s actions . . . resulted in non-consensual sexual contact with [Jane] by means of coercion in violation of [DU's] policies." (Appellant's App. at A159.) No hearing was held. Pursuant to its procedures, DU convened an outcome council to review the case and determine a sanction. The outcome council decided to permanently dismiss Plaintiff from DU. Plaintiff submitted an internal appeal challenging the investigation process, but it was denied.

In his complaint, Plaintiff claimed the disciplinary proceedings DU subjected him to violated Title IX. The district court granted Defendants summary judgment on the claim, concluding Plaintiff had failed to adduce evidence showing DU's actions were motivated by gender bias.

8

"We review the district court's summary-judgment order de novo, applying the same standard that the district court is to apply." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015) (internal quotation marks omitted). "In reviewing a motion for summary judgment, we review the facts and all reasonable inferences those facts support[] in the light most favorable to the nonmoving party." *Evans*, 944 F.3d at 852 (internal quotation marks omitted).

Title IX provides that "[n]o person in the United States shall, on the basis of [gender], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is "enforceable through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (explaining the Supreme Court "ha[s] consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional [gender]

9

discrimination"). Generally, to succeed on a claim under Title IX, "a plaintiff must show: (1) that he or she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the exclusion from the program was on the basis of [gender]." *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). Here, there is no dispute that DU offers an educational program receiving federal assistance or that Plaintiff was excluded from participating in that program. Thus, the only issue is whether Plaintiff adduced sufficient evidence to raise a genuine dispute that he was excluded from DU on the basis of gender.

The district court concluded that Plaintiff had failed to adduce sufficient evidence to raise a genuine dispute that gender was a motivating factor in DU's decision to expel him. The court recounted the litany of evidentiary arguments Plaintiff raised in opposition to summary judgment but in the end concluded that most of Plaintiff's evidence was aimed at demonstrating that DU was biased in favor of sexual-misconduct complainants and against sexual-misconduct respondents. In the court's view, assuming Plaintiff had created a genuine dispute that DU's process is biased against respondents, it was not reasonable to infer from this, without additional evidence, that DU's process is biased against males. The court found the remainder of Plaintiff's evidence similarly unavailing, concluding that none of it raised a genuine dispute that DU's decision was motivated by gender bias.

10

On appeal, Plaintiff argues that the district court erred both in refusing to consider all of the evidence he presented and in concluding that his evidence was insufficient to support an inference that DU's decision to expel him was motivated by gender bias. We consider these arguments in turn.

## A. Exclusion of Evidence

In support of his opposition to summary judgment, Plaintiff submitted the expert report of law professor Aya Gruber. In her report, Prof. Gruber opines that Plaintiff's disciplinary proceeding was marked by numerous deficiencies that give rise to an appearance of bias based on gender stereotypes. The court declined to consider Prof. Gruber's report in its assessment of Plaintiff's Title IX claim for two reasons. First, the court pointed out that Plaintiff cited the report in his opposition only three times, and never in support of his Title IX claim. Second, although the court acknowledged that the report highlights alleged deficiencies in the disciplinary proceedings against Plaintiff, the court concluded the report was not material to the question before it—whether DU's decisions were motivated by gender bias. On appeal, Plaintiff argues the court erred by failing to consider Prof. Gruber's report in support of his Title IX claim.[6] He contends the court should have considered the

---

[6] After filing their motion for summary judgment, Defendants filed a motion to exclude Prof. Gruber's expert testimony pursuant to Fed. R. Evid. 702. Because the district court concluded it would not consider Prof. Gruber's report on other grounds, the court declined to resolve DU's motion to exclude her expert testimony under Rule 702 and denied the motion as moot. On appeal, some of Plaintiff's argument is directed at showing that Prof. Gruber was qualified and that her testimony should

11

report because it directly addresses the issue the district court said it did not, namely whether gender bias was a motivating factor in DU's decision to expel him.

"We review a district court's decisions excluding evidence at the summary judgment stage only for an abuse of discretion." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). "Under this standard, we will not disturb the district court's decision unless we have a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted). Under Rule 56, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56 (c)(1). Where a report or other material is "made part of the record" but the party "fail[s] to cite to the 'particular parts' of the record that support[] [a particular] argument," the district court is "under no obligation to parse through the record to find the uncited materials." *Unal v. Los Alamos Pub. Sch.*, 638 F. App'x 729, 742 (10th Cir. 2016); *see also Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) ("[I]t is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." (ellipsis and internal quotation marks omitted)); *Mitchell v. City of Moore*,

---

have been admitted under Rule 702. Because the district court never decided those issues, we do not address them.

218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the non-movant]'s arguments for him.").

The district court did not abuse its discretion in declining to consider Prof. Gruber's report for purposes of the Title IX claim. Even assuming the court misapprehended the contents of Prof. Gruber's report, the court properly declined to consider it in addressing the Title IX claim because Plaintiff failed to cite the report in his summary-judgment arguments regarding that claim. Instead, he only cited the report (1) in his statement of facts to dispute DU's assertion that its investigators understood the preponderance-of-the-evidence standard and (2) in his arguments regarding his state-law claims to assert, based on the investigators' allegedly one-sided credibility assessments, that there remained a genuine dispute whether the investigation was thorough, impartial, and fair enough to satisfy DU's contractual obligations. Plaintiff neither cited the report nor discussed the investigators' understanding of the preponderance standard or their credibility assessments in his arguments regarding his Title IX claim. In other words, Plaintiff did not meet his burden to cite the particular part of the record he now claims should have been considered to support his Title IX argument. *See Unal*, 638 F. App'x at 742. Under these circumstances, we cannot fault the district court for declining to parse through the record in order to conjure up arguments from the record that Plaintiff might have

13

made on his own, and its decision to refrain from doing so was no abuse of discretion.[7]

B. Evidence of gender bias

On appeal, Plaintiff argues that several categories of evidence he adduced in the district court were sufficient to create a genuine dispute regarding whether gender was a motivating factor in the proceeding DU brought against him. We evaluate each category in turn.

*First*, as other plaintiffs have in recent years, Plaintiff sets the stage for his Title IX claim by shining a spotlight on the 2011 Dear Colleague Letter, which "ushered in a more rigorous approach to sexual misconduct allegations," *Doe v.*

---

[7] On appeal, Defendants assert that Plaintiff adduced no direct evidence of gender bias and that, even if we concluded the district court erred by refusing to consider Prof. Gruber's report, we should nonetheless affirm the dismissal of the Title IX claim because a party opposing summary judgment cannot rely solely on an expert report to create a genuine dispute on a material issue. This argument is debatable. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) (explaining that "expert testimony . . . may resolve or keep open certain questions of fact" at summary-judgment stage); *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 264 (4th Cir. 1998) (concluding that expert testimony on causation element, standing alone, is sufficient to support jury verdict). Defendants also argue that Prof. Gruber's report is unsworn and is thus not competent summary judgment evidence. This argument is likewise debatable. Prof. Gruber signed and dated her report and later signed and dated a declaration, sworn under penalty of perjury, stating that the report, which she attached, was a true and correct copy. These actions might satisfy the requirements of 28 U.S.C. § 1746, which would render Prof. Gruber's report competent for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(4) advisory committee's notes to 2010 Amendments. Ultimately, however, we decline to address these arguments because we conclude the district court properly refused to consider Prof. Gruber's report, regardless of whether it was competent summary judgment evidence.

*Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019); *accord Menaker v. Hofstra Univ.*, 935 F.3d 20, 26 (2d Cir. 2019), by providing guidance to schools receiving federal funding regarding Title IX's requirements as they relate to sexual assault. Moreover, Plaintiff presents evidence specific to DU's response to the DCL, which included "engag[ing] national experts" to "evaluat[e] its processes"; "[c]reat[ing] a team of administrators to address concerns"; establishing positions for a Title IX coordinator and a second Title IX investigator at the school; altering its investigative model; engaging in several sexual-assault awareness campaigns on campus; and "review[ing and] revis[ing]" its "support and resources for victims," methods of "handl[ing] expressions of concern," and "prevention efforts." (Appellant's App. at A507.) Plaintiff further presents evidence that DU's training materials warned employees that they "need to take [compliance with Title IX] very seriously" because it "is the focus of OCR right now," emphasizing that (1) the Department of Education could "cut off federal funding/initiate proceedings to do so"; (2) OCR could commence "compliance review," which "is very time consuming, creates extremely negative publicity for the school, and is very thorough"; and (3) "individual employees" could be "personally sued in a civil lawsuit by student[s]" if they failed to comply with Title IX or "possibly . . . be held personally liable" if they were "aware of sexual harassment of student[s] and show[ed] 'deliberate indifference'" to it. (*Id.* at A510–11.) Plaintiff then contends that the DCL and the pressure DU felt to comply with its guidance give rise to an inference of gender bias.

15

The majority of other courts to have considered this issue have concluded that, although evidence of the DCL and external pressure placed on the school to conform with its guidance may provide the plaintiff with "a story about why [the school] might have been motivated to discriminate against males accused of sexual assault," such evidence is insufficient in itself to support any inference that the school's actions in a particular case were motivated at least in part by gender bias. *Purdue Univ.*, 928 F.3d at 669; *see also, e.g.*, *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("Of course, all of this external pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."). We agree. The DCL is gender-neutral on its face, *see Neal v. Colo. State Univ.*, No. 16-cv-873-RM-CBS, 2017 WL 633045, at *11 (D. Colo. Feb. 16, 2017), and evidence that a school felt pressured to conform with its guidance cannot alone satisfy Title IX's fundamental requirement that the challenged action be "on the basis of [gender]," 20 U.S.C. § 1681(a). Thus, Plaintiff's evidence of the DCL and the pressure DU felt to comply with its guidance cannot support his summary judgment burden unless combined with a "particularized 'something more,'" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019), that would indicate that DU's decision in his particular case was based on his gender. And, as explained below, we conclude that Plaintiff has not made this particularized showing here.

16

*Second*, Plaintiff points to statistical evidence showing an overwhelming disparity in the gender makeup of sexual-assault complainants and sexual-assault respondents at DU.  Specifically, between 2011 and 2016, nearly all complainants (35 out of 36) were female, and all respondents (36 out of 36) were either listed as male or could be presumed to be male based on the nature of the complaint.  Plaintiff does not explain how this disparity amounts to gender bias on the part of DU, except to say that DU should have expected that its implementation of the DCL's guidance would disproportionately affect men because the DCL was intended to address a perceived epidemic of male sexual assault against women.  But, on its face, the DCL says no such thing, and Plaintiff points to no evidence suggesting that DU changed its policies in light of this statistical disparity or in order to combat sexual assault perpetrated specifically by men against women.  At best, then, the statistical disparity can only create a genuine dispute to the extent it generates a reasonable inference that DU's decision to expel Plaintiff was motivated by considerations of gender.  Plaintiff's argument thus reduces down to an inferential proposition:  a factfinder can reasonably infer from the fact that sexual-assault respondents are overwhelmingly male that a school's decision to initiate proceedings against respondents is motivated by the fact that they are male.

Assessing what inferences may reasonably be drawn from the statistical disparity in the gender makeup of sexual-assault complainants and respondents is one of the more perplexing aspects of addressing Title IX challenges to sexual-

17

misconduct disciplinary proceedings.[8] *See Doe v. Univ of Colo. ex rel. Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1075–76 (D. Colo. 2017) (cautioning against accepting or rejecting inferences in similar context without reflection). The courts that have engaged in this analysis have generally concluded that statistical disparities in the gender makeup of complainants and respondents can readily be explained by "an array of alternative" nondiscriminatory possibilities, potentially "reflect[ing], for example, that male students on average . . . committed more serious assaults," that sexual-assault victims are likelier to be women, or that female victims are likelier than male victims to report sexual assaults. *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019); *see also Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92 (1st Cir. 2018); *Doe v. Cummins*, 662 F. App'x 437, 453–54

---

[8] Under similar anti-discrimination statutes, statistical disparities of this nature are often used to prove a disparate-impact theory of liability, which does not require proof of intentional discrimination. Some courts of appeals, however, have held or suggested that a disparate-impact theory of liability is not cognizable under Title IX. *See Fort v. Dallas Indep. Sch. Dist.*, 82 F.3d 414 (table), 1996 WL 167072 at *3 n.3 (5th Cir. 1996) (noting circuit split). Although noting that "there has been some question whether Title IX prohibits disparate impact discrimination," we have suggested that a Title IX disparate-impact claim might be viable, *Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311, 316 n.6, 318 (10th Cir. 1987), but we have never directly addressed the issue. This appeal does not present an occasion to do so, as Plaintiff disclaims any reliance on a disparate-impact theory of liability. But, aside from proving disparate impact, "proper evidence of a statistical disparity may [also] generate an inference of intentional discrimination" if it "'tend[s] to show that there was a causal connection between the outcome of the disciplinary proceedings and gender bias.'" *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019) (brackets omitted) (quoting *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 91 (1st Cir. 2018)).

(6th Cir. 2016); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 607–08 (S.D. Ohio 2016). When the statistical evidence does nothing to eliminate these obvious, alternative explanations for the disparity, an inference that the disparity arises from gender bias on the part of the school is not reasonable. *See Haidak*, 933 F.3d at 75; *Bos. Coll.*, 892 F.3d at 92; *Cummins*, 662 F. App'x at 453–54; *Univ. of Cincinnati*, 173 F. Supp. 3d at 607–08.

We agree with this analysis. A factfinder could not reasonably infer from bare evidence of statistical disparity in the gender makeup of sexual-assault complainants and respondents that the school's decision to initiate proceedings against respondents is motivated by their gender. This is so because, at least in the discrimination context, the extent to which a discriminatory motive may be reasonably inferred from evidence of statistical disparity often depends on the evidence's ability to eliminate obvious nondiscriminatory explanations for the disparity. *See Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011) ("In order to be probative of discrimination, statistical evidence must eliminate nondiscriminatory explanations for the disparity." (internal quotation marks omitted)); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) ("In order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity." (brackets omitted) (quoting *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991)); *Schulte v. Potter*, 218 F. App'x 703, 714 (10th Cir. 2007) (explaining that, where evidence "wholly fail[s] to

19

eliminate nondiscriminatory explanations for" disparate treatment, "[i]t would be unreasonable to draw an inference of" intentional discrimination (internal quotation marks omitted)).

This principle is especially applicable here. In employment discrimination cases, the nondiscriminatory explanations for statistical disparity that prevent an inference of discriminatory intent often involve the employer's own hiring or promotion criteria. *See, e.g.*, *Turner*, 563 F.3d at 1148. One might suspect that the principle requiring a plaintiff to negate nondiscriminatory explanations of statistical disparity would be at its weakest where the defendant controls the putative nondiscriminatory causes of disparate treatment. In Title IX challenges to sexual-misconduct proceedings, however, the putative nondiscriminatory causes of disparity—the gender makeup of sexual-assault perpetrators, victims, and reporters—are almost completely beyond the control of the school. *See Univ. of Colo.*, 255 F. Supp. 3d at 1078 ("[T]he University is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct." (internal quotation marks omitted); *accord Cummins*, 662 F. App'x at 454. We think then that the principle would be at its strongest in this context.[9]

_____

[9] Further, statistical disparity by itself does little to inform the factfinder of whether the school was motivated by gender with respect to the particular proceeding brought against the plaintiff. *See Haidak*, 933 F.3d at 75 ("Even if one could infer from the data that another decision maker issued higher penalties based on [gender], that inference says little about whether the decision maker in this case brought to bear any bias on the basis of [gender]."); *Turner*, 563 F.3d at 1147 ("Turner's

Here, Plaintiff's statistical evidence does not create a reasonable inference that DU's decisions regarding the initiation of sexual-misconduct proceedings were motivated by considerations of gender. His statistical evidence does nothing to eliminate the nondiscriminatory explanations for the disparity identified above, and thus it would be unreasonable for a factfinder to infer from the statistical disparity alone that DU decides to initiate proceedings against respondents based on their gender. Something more is needed to show the disparity results from gender bias rather than nondiscriminatory, exogenous factors—something like an affidavit from a knowledgeable person stating the school exhibits a pattern of prosecuting complaints against male but not female students, *see Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018), or a statement from school officials touting such statistics in response to public criticism of the school's previous handling of female students' sexual-assault allegations, *see Doe v. Geo. Wash. Univ.*, 366 F. Supp. 3d 1, 12–13 (D.D.C. 2018). Plaintiff points to no additional evidence of this kind.

*Third*, Plaintiff points to evidence of DU's alleged bias against respondents in sexual-misconduct proceedings. Specifically, Plaintiff presented evidence that DU's

---

statistic regarding the gender imbalance of the . . . workforce . . . does not, without additional evidence, suggest that Turner herself experienced discrimination. The numbers fail to provide any information regarding whether the decision not to hire Turner, and that decision alone, involved discrimination on the basis of [gender]." (internal quotation marks omitted)).

21

training materials[10] referred to sexual-misconduct complainants as "survivors" and directed staff to "[e]mpower the survivor" and "[c]ommunicate that you believe the survivor." (Appellant's App. at A519.)[11] Plaintiff also presented evidence that, when the investigation against him began, DU provided a list of resources to him and Jane to help them navigate the Title IX process. Plaintiff asserts these resources were complainant-specific and thus supported the needs of complainants but not respondents. For instance, Ms. Grove testified at her deposition that one resource on the list, the Center for Advocacy and Prevention and Empowerment, did not "support men who were accused of sexual assault." (*Id.* at A351.) Of course, as the district court noted, there is no evidence in the record that CAPE would support women

---

[10] Plaintiff also points to Prof. Gruber's report, which asserts that the training received by the two investigators assigned to Plaintiff's case, Mr. Butler and Ms. Grove, was suffused with stereotypical assumptions about men and women, leading them to investigate Jane's allegations in a gender-biased way. We have already concluded that the district court did not err by declining to consider Prof. Gruber's report for purposes of Plaintiff's Title IX claim. We do not consider the report here either.

[11] In this same vein, Plaintiff points out that DU's Title IX Coordinator, Defendant Jean McAllister, referred to complainants as "victims" and "survivors" during her deposition and acknowledged approaching interviews of complainants with the belief that they are "survivor[s]" and that their "report[s] [are] legitimate." (Appellant's App. at A431–32.) Citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2002), the district court concluded that any indication that Ms. McAllister had a bias against males was irrelevant because Plaintiff had failed to raise a genuine dispute that Ms. McAllister, who began her position with DU as the proceeding against Plaintiff neared its end, had any meaningful involvement in the proceeding. Plaintiff does not contest this conclusion on appeal, so his argument regarding Ms. McAllister's bias is waived. *See Talley v. Time, Inc.*, 923 F.3d 878, 906 n.28 (10th Cir. 2019).

accused of sexual assault either, and Ms. Grove testified that other resources on the list would provide support to men accused of sexual assault. Additional testimony from Ms. McAllister that Plaintiff himself points to—that she would like to develop named support programs for respondents in the same way DU has developed named support programs for complainants—highlights that Plaintiff's argument is based on the relative disparity between resources for complainants and resources for respondents.

Whether factfinders may reasonably infer anti-male bias from evidence of a school's anti-respondent bias is another thorny issue that often arises in Title IX challenges to sexual-misconduct disciplinary proceedings. *See Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1014–15 (D. Colo. 2019); *Univ. of Colo.*, 255 F. Supp. 3d at 1075–76. Most courts to have addressed the issue have concluded that evidence of a school's anti-respondent bias does not create a reasonable inference of anti-male bias. *See Cummins*, 662 F. App'x at 453; *Doe v. Rider Univ.*, No. 3:16-cv-4882-BRM-DEA, 2018 WL 466225, at *10 (D.N.J. Jan. 17, 2018); *Doe v. Colgate Univ.*, No. 5:15-cv-1069 (LEK/DEP), 2017 WL 4990629, at *11 (N.D.N.Y Oct. 31, 2017); *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956–57 (N.D. Ill. 2017); *Ruff v. Bd. of Regents of Univ. of N.M.*, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017); *Univ. of Colo.*, 255 F. Supp. 3d at 1079; *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 991 (D. Minn. 2017); *Doe v. Univ. of Mass.*, No. 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573,

579 (E.D. Va. 1996). They reason that evidence of a school's anti-respondent bias does not permit a reasonable inference of an anti-male bias because both males and females can be respondents. *See, e.g.*, *Cummins*, 662 F. App'x at 453 ("[A] disciplinary system that is biased in favor of alleged victims and against those accused of misconduct . . . does not equate to gender bias because sexual-assault victims can be both male and female.").

We agree. We have relied on the same rationale in the employment discrimination context and have held that, on its own, evidence of an employer's discriminatory treatment of a group to which both genders can belong does not give rise to an inference of gender discrimination. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1148–49 (10th Cir. 2008) ("'Familial status' is not a classification based on [gender] any more than is being a 'sibling' or 'relative' generally. It is, by definition, gender neutral. . . . Assertions that an employer discriminated against an individual on the basis of his or her 'familial status' alone state no cognizable cause of action under Title VII.").[12] The reasoning

---

[12] Other courts have also employed this rationale in employment discrimination cases involving employer policies that might be understood to discriminate against a group that may include both men and women, such as employees who suffer from infertility or employees who are new parents. *See, e.g.*, *Saks v. Franklin Covey Co.*, 316 F.3d 337, 347 (2d Cir. 2003) ("Because male and female employees . . . are equally disadvantaged by the [policy], we conclude that the Plan does not discriminate on the basis of [gender]."); *Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997) (explaining that "[a]n employer's discrimination . . . based on a gender-neutral status potentially possessible by all employees, including men and women," is not cognizable); *cf. Hall v. Nalco Co.*, 534

24

applies equally well in the Title IX context. *See Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). Classification as a sexual-misconduct respondent is not a classification based on gender. It is gender-neutral because both men and women can be respondents. Accordingly, by itself, evidence of a school's anti-respondent bias does not permit a reasonable inference of discrimination based on gender.

Here, Plaintiff's evidence demonstrates at most that DU had an anti-respondent or pro-complainant bias, which is insufficient to create an inference of anti-male bias. A number of courts have determined that references to complainants as "victims" or "survivors" or language suggesting a pro-victim viewpoint exhibits at most a bias in favor of complainants *qua* complainants and against respondents *qua* respondents. *See Bos. Coll.*, 892 F.3d at 92; *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 661 n.6 (D. Conn. 2019); *Rider Univ.*, 2018 WL 466225, at *10; *Colgate Univ.*, 2017 WL 4990629, at *14–15; *Columbia Coll. Chi.*, 299 F. Supp. 3d at 955. Plaintiff's reliance on similar pro-victim language in DU's training materials at most demonstrates an anti-respondent bias. Likewise, the relative lack of support resources DU offers to respondents compared to the resources it offers complainants

---

F.3d 644, 646–49 (7th Cir. 2008) (implying that policy affecting group that includes both male and female employees is not cognizable).

demonstrates at most a bias against respondents.  However, this evidence of anti-respondent bias does not raise an inference of discrimination based on gender.[13]

*Fourth*, Plaintiff argues the investigators exhibited bias by finding Plaintiff responsible for non-consensual sexual contact despite evidence supporting his version of the events.  In Plaintiff's view, the evidence before the investigators so clearly favored a finding that Plaintiff's and Jane's sexual encounter was consensual that the investigators' finding to the contrary creates an inference of bias in their decision.

For support, Plaintiff relies on *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016).  In *Columbia University*, the Second Circuit reviewed an order dismissing a complaint pursuant to Fed. R. Civ. P. 12(b)(6).  According to the allegations in the complaint, the student complainant was "an altogether willing participant" in the underlying sexual encounter; "'no evidence was presented'" to the school's tribunal to support the complainant's claim that sexual activity was coerced; and the tribunal "chose to accept [the complainant's] unsupported accusatory version" of events and "declined even to explore the testimony of [the] [p]laintiff's witnesses."  *Columbia*

---

[13] Plaintiff's only response to this analysis has been to argue that his evidence of DU's anti-respondent bias amounts to evidence of an anti-male bias because the statistical evidence shows that respondents are overwhelmingly male.  But we have already determined that Plaintiff's statistical evidence is insufficient because it fails to eliminate non-gender-based explanations for the disparity.  Indeed, other courts have viewed a school's bias in favor of complainants as one of the legitimate, non-gender-based explanations for the disparity that bare statistical evidence fails to eliminate.  *See, e.g.*, *Univ. of Colo.*, 255 F. Supp. 3d at 1079.

*Univ.*, 831 F.3d at 57. These allegations, which the court was obligated to "accept in the light most favorable to [the] [p]laintiff," gave "plausible support to the proposition that the[ tribunal's members] were motivated by bias" because, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias." *Id.*

*Columbia University* does not aid Plaintiff's cause. We assume, without deciding, that the chief proposition from *Columbia University* Plaintiff relies on— that an inference of bias arises when an evaluator's decision in favor of one side lacks an apparent, evidence-based reason, and the evidence substantially favors the other side—is correct. But that proposition has no application here. Simply put, DU's investigators were not faced with a situation in which the evidence substantially favored Plaintiff. Unlike in *Columbia University*, there was evidence presented in favor of Jane's claim that the sexual encounter was not consensual, and it cannot be said that the investigators lacked an evidence-based reason for reaching their decision. Thus, it would not be plausible or reasonable to infer merely from the investigators' weighing of the evidence that they were biased.

Further, even if we agreed with Plaintiff that the evidence before the investigators was so one-sided in Plaintiff's favor that their decision in favor of Jane could reasonably give rise to an inference of bias, this would still fall short of

27

demonstrating bias based on gender. *Columbia University* itself acknowledges that an evaluator's decision at odds with the great weight of evidence "support[s] [an] inference of bias" but "not necessarily" a "bias on account of [gender]." *Id.* The Second Circuit instead concluded that additional allegations in the complaint gave "ample plausible support to a bias with respect to [gender]," namely "substantial criticism" from "the student body and in the public media, accusing the [school] of not taking seriously complaints of *female* students alleging sexual assault by *male* students" as well as an allegation that the school "was cognizant of, and sensitive to, these criticisms." *Id.* (emphasis added). Thus, in our view, the allegations at issue in *Columbia University* reflect gender-biased public pressure accompanied by procedural irregularity in the proceeding at issue. Here, however, Plaintiff has adduced only evidence of gender-neutral public pressure. So, even if we were to accept the inference of bias he presses, he has failed to adduce the additional evidence needed to demonstrate bias *on account of gender*.[14]

*Fifth*, Plaintiff argues that the severity of the sanction he received— expulsion—resulted from DU's anti-male bias. Under DU's policies, the outcome council is to consider a number of factors to determine an appropriate sanction for a student found responsible for violating DU's sexual-misconduct policy, including (1)

---

[14] Plaintiff again resorts to Prof. Gruber's report to argue that the investigation was pockmarked by procedural deficiencies that disfavored Plaintiff. We again do not consider Prof. Gruber's report.

28

the "nature and severity of the act," (2) the "number of complainants," (3) the "prior student conduct history of the respondent," (4) the outcome council's "assessment of the effect . . . the act or policy violation has on the complainant, community[,] and University environment," and (5) the "complainant['s] and community['s] safety." (Appellant's App. at A153 (capitalization standardized).) Plaintiff also elicited deposition testimony from Defendant Kristin Olson, a member of DU's outcome council in Plaintiff's proceeding, that, in her experience, the respondent was expelled in every case where investigators found non-consensual sexual conduct involving penetration. Plaintiff also points to DU's records confirming that, for the 14 non-consensual sexual contact cases between 2013 and 2016 that resulted in dismissal or rescission of an admission offer, each case involved a female complainant, a male respondent, and allegations of penetration.

Plaintiff contends that DU, in derogation of its own policies, expels males found responsible for non-consensual sexual contact involving penetration regardless of the circumstances. For instance, in his case, Plaintiff points out that several of the factors the outcome council was required to consider weighed in his favor: the allegations did not involve physical violence or lead to a criminal investigation; only one complainant accused him of misconduct; he had no prior record of student conduct issues; and the facts that Plaintiff and Jane met socially after the incident and that DU did not impose an interim suspension on him after the complaint was filed suggest he posed no threat to Jane's or the community's safety. He argues that the

29

outcome council simply ignored these factors and imposed expulsion without considering them. The severity of the sanction, Plaintiff asserts, gives rise to an inference of bias on account of gender, as it reflects a belief that males need to be sanctioned severely for sexual misconduct.

A factfinder could not reasonably infer from this evidence that the severity of the sanction DU imposed was motivated by Plaintiff's gender. First, Plaintiff ignores the fact that DU's policies, in addition to laying out factors for the outcome council to consider, also expressly state that, "[i]n general[,] violations of the non-consensual sexual contact provision" of the policy "typically result in a dismissal." (*Id.* at A154.) Moreover, much of Plaintiff's argument again relies to some degree on evidence of a statistical disparity between the numbers of men and women expelled from DU for engaging in non-consensual sexual contact involving penetration. However, for evidence of this nature to raise an inference of gender bias, it must eliminate obvious, nondiscriminatory explanations for the disparity. Again, Plaintiff has not eliminated the obvious, nondiscriminatory explanation that DU, as expressed in its own policy, has legitimate interests in expelling students—regardless of their gender—who engage in non-consensual sexual contact, and, though not expressed in its policies, DU might have even greater interests in doing so when that contact involves penetration. In short, something more is needed to show that the cited expulsions resulted from the fact the respondents were male rather than the fact they were found responsible for sexual misconduct, but Plaintiff has failed to adduce it.

30

To the extent Plaintiff contends that the outcome council ignored the factors it was required to consider in his proceeding, that contention is not borne out by the record. Plaintiff points to no evidence showing that the outcome council failed to consider the factors. In fact, the only evidence in the record on this point—Ms. Olson's deposition testimony—strongly suggests the outcome council did consider those factors when contemplating the sanction it would impose on Plaintiff. Her testimony also strongly suggests the outcome council concluded that the nature and severity of the contact (non-consensual penetration) and the threat Plaintiff posed to the community (as he did not consider himself responsible and was thus unlikely to rehabilitate) outweighed any of the factors that might be in his favor. The outcome council's letter to Plaintiff notifying him of its decision specifically referenced these two factors, explaining that its decision to expel him was "due to the nature and severity of [Plaintiff]'s actions and in an effort to protect the community." (Appellant's App. at A163.) We have no call to review the outcome council's consideration of these sanctioning factors, for, where the evidence regarding sanctioning factors is not clearly one-sided, the mere fact that Plaintiff or this court might have considered the factors differently or imposed a less severe sanction does not create a reasonable inference of bias, let alone bias based on gender. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 33 (2d Cir. 2019); *cf. Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

31

Further, even if we agreed that DU's pattern of sanctions exhibited some bias against students who, like Plaintiff, are found responsible for non-consensual sexual contact involving penetration, this would not amount to a bias *on account of gender*. This is so because both men and women can engage in non-consensual sexual contact, and, for both men and women, that contact can involve penetration.[15] As we have explained above, evidence of a school's discriminatory treatment of a group that can include both men and women does not create a reasonable inference of gender discrimination. *See Adamson*, 514 F.3d at 1148–49. DU's treatment of students found responsible for non-consensual sexual contact involving penetration is gender-neutral because both men and women can be included in that group. Thus, DU's alleged bias against that group does not permit a reasonable inference of bias based on gender.

*Sixth*, Plaintiff argues that DU encouraged the filing of sexual-misconduct complaints specifically against males. For support, Plaintiff cites his own deposition testimony in which he stated that DU placed "numerous posters all around the school" to encourage the reporting of sexual misconduct and recalled seeing one "poster that said [']if you regret it, it was rape.[']" (Appellant's App. at A425–26.) In Plaintiff's view, this kind of encouragement was intended to increase the number of sexual-misconduct complaints in a way that targeted males.

---

[15] Ms. Olson's deposition testimony makes clear that DU considers penetration to include oral, anal, or vaginal penetration with a penis, digit, or foreign object.

32

To the extent Plaintiff contends that an inference of anti-male bias arises from DU's attempts to encourage sexual-misconduct reporting generally, we find any such argument unpersuasive. At most, encouragement of this nature might possibly be construed as exhibiting a bias against potential respondents because it increases the likelihood that potential respondents will be subjected to investigation and possibly sanctioned if found responsible. But both men and women can be potential respondents, and therefore any bias against them would not be bias on account of gender.

As for the specific poster Plaintiff recalls, the poster's language—"if you regret it, it was rape"—viewed in Plaintiff's favor, can reasonably be interpreted to encourage the reporting of sexual misconduct committed specifically by men against women. Although in modern usage "rape" can refer generally to "forced, non-consenting, or illegal sexual intercourse with another person" or "sexual violation or assault," regardless of the gender of the perpetrator or victim,[16] the term "[o]riginally" and still "chiefly" can refer to "the act or crime, *committed by a man*, of forcing a *woman* to have sexual intercourse with him against her will." *Rape*, Oxford English Dictionary (3d ed. 2008) (emphasis added). Thus, viewed in Plaintiff's favor, the poster could be understood to have been directed at women who

---

[16] *See also Rape*, American Heritage Dictionary of the English Language (5th ed. 2011) (defining the term without reference to the gender of either perpetrator or victim).

had sexual encounters with men, and it encouraged them to view and report encounters with men they regretted as instances of sexual misconduct by equating regret, which typically is not viewed as an indication of misconduct, with rape, perhaps the most serious form of misconduct.

Even viewed in Plaintiff's favor, however, the poster does not create a genuine dispute that DU was motivated by considerations of gender in Plaintiff's proceeding. For one thing, there is no evidence suggesting that the poster Plaintiff recalls was sponsored or approved by DU or that its message otherwise can be attributed to DU generally or to any of the decisionmakers in his proceeding specifically.[17] *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 911 (10th Cir. 2011) ("[E]vidence of discrimination in the decision-making process must be distinguished from 'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" (quoting

_____

[17] In other contexts, when a plaintiff's claim hinges to some degree on a message contained in a poster, flyer, or the like, courts have often looked for indications that the message can be attributed to the defendant. *See, e.g.*, *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 525 (3d Cir. 2004); *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, No. 13-CV-4340 (CS), 2015 WL 1379702, at *5 (S.D.N.Y Mar. 25, 2015); *DeCarolis v. Presbyterian Med. Ctr.*, No. 11-cv-1422, 2012 WL 12860872, at *6 (E.D. Pa. Aug. 20, 2012); *Chacas v. City of Ely*, 615 F. Supp. 2d 1193, 1209 (D. Nev. 2009). And in the context of challenges to sexual-misconduct disciplinary proceedings, courts have emphasized that circumstantial evidence of gender bias on the part of non-decisionmakers is largely irrelevant. *See, e.g.*, *Haidak*, 933 F.3d at 75. We have made the same point in employment discrimination cases. *See, e.g.*, *Turner*, 563 F.3d at 1147.

*Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000))).

Thus, the poster's connection to DU's motivations in pursuing sexual-misconduct allegations generally, not to mention its motivations in regard to Plaintiff's proceeding particularly, is tenuous at best. And, even if the poster could be attributed somehow to DU or the decisionmakers at issue, it amounts to nothing more than "an isolated and ambiguous comment" that "is generally considered too abstract to support an inference of discrimination." *Adamson*, 514 F.3d at 1151. Beyond this, we think a single reference in Plaintiff's own deposition testimony to an ambiguously-worded poster with nothing connecting it to DU, the relevant decisionmakers, or Plaintiff's proceeding amounts to nothing more than a scintilla of evidence that is insufficient to withstand summary judgment. *See Turner*, 563 F.3d at 1142.

In sum, we conclude the district court did not err in determining that Plaintiff failed to adduce sufficient evidence to create a genuine dispute that DU was motivated by considerations of gender in the proceeding it brought against him. The only potential evidence of bias on account of gender Plaintiff presented was his recollection of the if-you-regret-it-it-was-rape poster, which is simply too thin a nail to hang a claim of gender bias on. Aside from the poster, Plaintiff's evidence demonstrates, at most, only that (1) as is almost certainly the case at nearly every school, the overwhelming majority of sexual-misconduct respondents are men, and (2) DU's policies and procedures exhibit an anti-respondent bias. As we have

35

explained, neither the statistical disparity in the gender makeup of respondents nor evidence of an anti-respondent bias can create a reasonable inference of bias on account of gender.

We are not unmindful that the combination of this statistical disparity and overt anti-respondent bias—a combination not unlikely to recur with some frequency at other schools—raises palpable concerns that schools might be making a distinction without a real difference and that stereotypes and prejudices against a class protected by Title IX (males) are beginning to infect the enforcement of sexual-misconduct policies under the auspices of presumptions regarding an unprotected class (respondents). *See generally Univ. of Colo.*, 255 F. Supp. 3d at 1075–76.[18]

---

[18] This concern is only heightened when there is not only evidence that the school exhibits an anti-respondent bias generally but also colorable evidence that the school employed that bias in the sexual-misconduct proceeding at issue. Here, for instance, there is colorable evidence that the investigators:

- refused to follow leads that were potentially exculpatory;
- disbelieved Plaintiff from the outset due to the "innate motive" respondents have to lie about wrongdoing (Suppl. App. at 61), while failing to consider obvious motives Jane might have to lie about the extent to which she initiated or invited the sexual encounter with Plaintiff, such as her new boyfriend's insistence that she report the incident as well as his presence at her initial reporting and subsequent interviews;
- selectively determined which post-encounter evidence they would consider relevant (*e.g.*, considering Jane's allegation that Plaintiff offered her Aderall after the encounter in assessing Plaintiff's credibility but not considering Jane's inconsistent statements on whether the two saw each other after the encounter in assessing her credibility);
- allowed Jane's boyfriend to act both as Jane's support person who was present at her interviews and as a fact witness who provided information in the

proceeding to corroborate Jane's story and to impeach the testimony of witnesses who contradicted her story, in violation of DU's policies;

- selectively viewed Jane as "heavily intoxicated," implicitly rejecting Plaintiff's and his roommate's statements that Jane exhibited no indication of intoxication in order to support a finding that Plaintiff coerced Jane into sex (Suppl. App. at 58) but then accepting Plaintiff's and his roommate's statement in order to find that Jane's intoxication had little effect on her ability to accurately recollect the encounter that night;
- faulted Plaintiff for making corrections to his summary statement and used it to attack his credibility, despite expressly inviting Plaintiff to make such corrections and apparently violating DU's informal policy allowing interviewees to correct summary statements in order to accurately reflect their testimony;
- emphasized inconsistencies in Plaintiff's and his roommate's story while disregarding numerous inconsistencies in the versions of the story told by Jane and her friend;
- suggested Plaintiff's failure to recollect details was indicative of deception and guilt while suggesting Jane's failure to recollect details was the result of intoxication;
- viewed Plaintiff's roommate's statements corroborating Plaintiff's story as tainted by Plaintiff's and his roommate's prior conferral regarding the events of that night, while not applying this same logic to the statements of Jane's friend who corroborated Jane's story, even though Jane called her friend specifically to relate to him "her portrayal of the night" and to tell him "that it was rape" (Appellant's App. at A229);
- attacked Plaintiff's and his roommate's credibility on the grounds they seemed overly eager to offer consistent denials of any on-campus alcohol use, without applying the same logic to the vague and inconsistent stories provided by Jane and her friend regarding their own on-campus alcohol use, even though DU offers amnesty to complainants who admit to on-campus drug and alcohol use, but not to respondents.

A few procedural irregularities in this vein are not necessarily uncommon or even all that troubling. After all, sexual-misconduct investigations and proceedings will not be perfect. But an accumulation of irregularities all disfavoring the respondent becomes deeply troubling because benign, stochastic explanations for the errors become implausible. Instead, it looks more like a railroading. Patterns of procedural irregularities like this become even more troubling when, as in the case of DU's investigative model, the investigators committing such errors are also the finders of fact on the ultimate issue of whether the alleged sexual misconduct

37

Nevertheless, these concerns do not alter the obligation of a Title IX plaintiff opposing summary judgment to adduce evidence from which a reasonable factfinder could infer that the school's proceeding was motivated by considerations of gender. We will therefore affirm the grant of summary judgment to Defendants.

\* \* \*

We **AFFIRM** the district court's summary judgment order dismissing with prejudice Plaintiff's Fourteenth Amendment Due Process and Title IX claims and dismissing without prejudice his state-law claims and his claim for declaratory relief.[19]

Judge **BACHARACH** joins the opinion except for footnote 18.

---

occurred. Indeed, permitting, or even encouraging, an investigator who also acts as inquisitor, judge, and jury to harbor an anti-respondent bias is repugnant to basic notions of due process and substantial justice. However, as deeply troubling as this kind of bias may be, it is simply not proscribed by Title IX, which only prohibits discrimination "on the basis of [gender]." 20 U.S.C. § 1681(a).

[19] Plaintiff argues that the district court should have retained supplemental jurisdiction over his state-law claims because it erred in dismissing his federal-law claims. Because we conclude that the court properly dismissed the federal-law claims, we see no error in the court's decision to decline supplemental jurisdiction over the state-law claims.