**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 15, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN DOE,

　　　　Plaintiff - Appellant,

　v.

UNIVERSITY OF DENVER;
UNIVERSITY OF DENVER BOARD
OF TRUSTEES; REBECCA CHOPP,
individually and as agent for
University of Denver; KRISTIN
OLSON, individually and as agent for
University of Denver; JEAN
MCALLISTER, individually and as
agent for University of Denver; SIRI
SLATER, individually and as agent for
University of Denver; ERIC BUTLER,
individually and as agent for
University of Denver,

　　　　Defendants - Appellees.

No. 19-1359

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:17-CV-01962-PAB-KMT)**

Adrienne Levy, Nesenoff & Miltenberg, LLP (Andrew T. Miltenberg and Stuart
Bernstein, Nesenoff & Miltenberg, LLP, New York, New York, and Michael J.
Mirabella, Campbell, Bohn, Killin, Brittan & Ray LLC, Denver, Colorado, with
her on the briefs) New York, New York, for Appellant.

Jim Goh (E. Rayner Mangum with him on the brief), Constancy, Brooks, Smith &
Prophete, LLP, Denver, Colorado, for Appellees.

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

This case arises out of a sexual-misconduct investigation conducted by the University of Denver and the subsequent expulsion of John Doe after a classmate accused him of sexual assault. John sued the University and various school administrators (collectively, the University) alleging, among other things, that the University violated the sex discrimination prohibition of Title IX, 20 U.S.C. § 1681, because anti-male bias pervaded the sexual-misconduct investigation, resulting in a disciplinary decision against the weight of the evidence. The district court concluded John had failed to present sufficient evidence that the University's actions were motivated by bias against him because of his sex, and it therefore granted summary judgment to the University on John's Title IX claim.

John challenges that conclusion and alleges the district court applied the wrong legal standard in resolving his summary judgment motion. Exercising jurisdiction under 28 U.S.C. § 1291, we REVERSE. Applying the familiar *McDonnell Douglas* evidentiary standard to John's claim, we conclude he has provided sufficient evidence for a jury to decide whether the investigation into the

allegations and subsequent disciplinary action discriminated against him because of his sex.

# I.  Background

## A.  Factual Background

We review a district court's grant of summary judgment de novo and consider the facts and all reasonable inferences in favor of John, the party opposing summary judgment.  *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).

John Doe enrolled as an undergraduate at the University of Denver in 2015. In his first year at the University, John became romantically involved with a fellow first-year student, Jane Roe.  During January and February of 2016, Jane and John occasionally spent the night together.  On several occasions, they discussed having sexual intercourse but never did so.  The two also discussed the possibility of an exclusive relationship, but John was not interested in dating Jane, and he began to try to distance himself from her.  Jane expressed confusion about their relationship but continued to see John from time to time.

One Friday night, Jane and her friends drank alcohol in the dorms and later went to a bar.  Jane could not recall how she left the bar that night because she was intoxicated, but she eventually found her way to John, who was also intoxicated.  Jane led John to her dorm room, where they began kissing and

touching. A fellow student, I.K., later told investigators that Jane ran to I.K.'s room at one point because John became sick and passed out on the floor. I.K. offered to help move John, but Jane declined and stayed with John in her room overnight. John could not entirely recall what happened after this but remembered that he and Jane took their clothes off and tried unsuccessfully to have sexual intercourse.

Jane and John dispute what happened the following morning. John's account is that he and Jane had consensual sex: Jane woke him up, said "good morning," waited while he put on a condom, and then had sexual intercourse with him. App. 464. John said Jane did not ask why he was putting a condom on or try to resist having sex, and he said that Jane was positioned on top of him. But at some point, Jane got up abruptly and left the room. John said she returned ten minutes later and tried to talk to him about their relationship. John did not want to talk about their relationship and went back to his room, where he described these events to his roommate, T.D. John later told investigators: "I did not want to talk about it. I was still confused about why she got up and left. I had already made the decision to go back to my room. Previously I had been trying to distance myself from her. I felt like this had been a set back." *Id.* at 464.

Jane's account is that the pair had sexual intercourse without her consent. She said that she was still "pretty drunk" on Saturday morning when she woke up

to John fondling her. *Id*. at 456–57. According to Jane, she watched John put a condom on and begin having sexual intercourse with her, although she did not ask why he was putting a condom on or try to resist. At one point she asked him to stop because it hurt, but he assured her "it's going to, because it's your first time." *Id*. at 456. Jane said that she was on top of John at this point, and she did not otherwise verbally or physically resist John's advances. She said that John grabbed her leg when she moved it, and at various points throughout the encounter, she felt she could not leave the room. A short time later, she got up, said, "I need to leave," and went to the bathroom. *Id.* When she returned, John was still in her room. Jane said the two argued about what had happened, and John eventually left.

Jane, apparently upset that John left abruptly, texted him: "Thanks for finishing our conversation." *Id*. at 456, 493. Jane continued to text John, urging him to "finish the conversation," but John said "not right now" and upon further urging explained, "I just need some time." *Id*. at 493. Later that morning, Jane told her friend that she and John had sex.

That night, Jane went to a house party with friends, where she saw John talking to another young woman. Jane allegedly overheard John tell the young woman what had happened that morning, explaining that "she just left right in the

middle of it." *Id*. at 458. One of Jane's friends told investigators that Jane was very upset about this.

Another student, G.H.—whom the University would later credit as Jane's key witness—escorted Jane home after the Saturday night party because she was very intoxicated. According to G.H., Jane told him that the night before she had refused to have sex with a guy she was seeing, but "woke up the next morning and found him engaging in sexual intercourse with her." *Id.* at 634.

The following night, Jane called John and told him she could not remember anything that happened in her dorm room on Friday night and wanted to know if they had sexual intercourse. He said they did not. Jane also told John to stop telling people about Saturday morning, but she assured him "you didn't hurt me," "you didn't take anything from me," and "[I] willingly gave it to you" (referring to her virginity).[1] *Id.* 458, 504. John told Jane that he regretted having sex with her and thought the two should "give up on" their relationship because it "seemed unhealthy" and "was not working out." *Id.* at 465, 481.

Over the next few days, Jane relayed to over a dozen friends and acquaintances conflicting accounts of the encounter. It appears she initially believed John sexually assaulted her on Friday night, not Saturday morning, given

---

[1] Both John and Jane agree that Jane made these statements. *See* App. 458, 480, 665.

that she could not remember their sexual encounter that night and she had bruises that she could not explain. On Tuesday morning, Jane texted John to ask why she had these bruises. John said he didn't know where the bruises came from. He also told her "I know what you are insinuating about Friday. Don't. You invited me to your room, and started taking my clothes off." *Id.* at 498. Jane responded that she "wasn't insinuating anything" and later said, "I was asking you to tell me what happened because there were marks[, yet] you assume[d] the worst." *Id.* at 500, 508. Jane asked John to meet in person, but he responded that he didn't think they should "talk at all" and said "I don't want anything from you. That, I think, is the misunderstanding." *Id*. at 506.

Later that day, one of Jane's friends told her that she needed to go get a "rape kit" done, given the unexplained bruises and markings from Friday night. *Id.* 460, 467. Jane had a Sexual Assault Nurse Examiner's (SANE) report done, but because Jane would later refuse to turn the medical assessment portion of the report over to University investigators, any conclusions from this portion are not in the record.

On Thursday, March 10, John and Jane again spoke about the incident. Jane told him that she had been speaking with others about their sexual encounter and "someone else told me that it was sexual assault." *Id.* at 462. According to John, he asked Jane twice if she thought he sexually assaulted her. Jane said that she

was not making a decision about whether or not she was sexually assaulted but "letting other people tell" her. *Id.* at 511. John responded, "oh my god [Jane], there's a difference between regret and assault." *Id.* at 461. Jane told John she felt like she was "holding a gun, with one bullet and perfect aim." *Id.* at 511. But she explained that she was putting the gun down, and all "I want is privacy." *Id.* at 461.

Several weeks later, Jane found out that before spring break, John told three other students what happened. Jane later explained: "That's when I decided to report." *Id.* at 462. Jane filed a report with the University on March 24, 2016, about three weeks after the sexual encounter. One month later, Jean McAlister, the Director of Title IX for the University, sent John a letter informing him of the complaint and requesting that he participate in an interview, which he did. Investigators also interviewed Jane and eleven people with whom she had discussed the incident. John gave the names of five people with whom he had discussed the incident, but University investigators refused to interview them.

University investigators then issued a Preliminary Report summarizing these interviews and briefly describing their findings. This was the first time John was made aware of the specific allegations against him. After reviewing the report, John responded to the investigators by email, expressing concern that the University did not interview any of his proposed witnesses. In response, the

University decided to interview one of John's proposed witnesses, his psychologist, Dr. Mary Bricker, with whom he had discussed the allegations against him. After her interview, Dr. Bricker saw a summary of her statement, which caused her to send a follow-up letter to the University that expressed concern about the investigation's integrity. She alleged the University's summary of her statement was inaccurate and that throughout the interview, the investigator appeared to have "made up her mind already about what she th[ought] took place." *Id.* at 367. Dr. Bricker's statement to investigators was appended to the Final Report, but the report did not mention her letter questioning the integrity of the investigation.

John's email also expressed concerns about Jane withholding medical evidence, noting that most of the SANE report was missing from the Preliminary Report. A complete SANE report includes narrative summaries by the SANE nurse and the attending physician, as well as the patient's written statement regarding the source of the injuries. While Jane turned over one portion of the report that showed various bruises and abrasions, she omitted the SANE nurse's and attending physician's written descriptions of these injuries, including the age of the injuries and their likely causes.[2] Many of the bruises and abrasions are

---

[2] More specifically, Jane turned over a "Female Body Map," which shows a generic drawing of a female's body, which a doctor or nurse marked up to show
(continued...)

consistent with injuries one would sustain in a fall, such as scrapes on her knees, elbows, and the tops of her feet. John pointed out that the only portion of the report that was included was "written in medical shorthand, which was difficult to understand."[2] *Id.* at 563. Jane also omitted her own written statement regarding the source of the injuries. One investigator testified at his deposition that he asked Jane to provide the full SANE report, but she refused.

The investigators issued their Final Report in August 2016, finding that John more likely than not engaged in non-consensual sexual contact with Jane. Upon review of that finding, a University disciplinary review committee—consisting of two school administrators and one faculty representative—expelled John from the University.[3] John sought to appeal this decision, but the University found that his case did not meet "appeal criteria." *Id.* 291.

### B. Procedural History

---

[2](...continued)
Jane's bruises and scrapes. App. 512–17.

[2] Though the investigators had no medical expertise, they nevertheless concluded these bruises and abrasions corroborated Jane's story.

[3] The committee's role was limited to imposing a sanction based on the investigators' finding that, by a preponderance of the evidence, John had sexually assaulted Jane. The committee had no power to challenge or reverse that conclusion.

John sued the University of Denver and various school administrators alleging: (1) a violation of his rights under Title IX, 20 U.S.C. § 1681, (2) a violation of his procedural due process rights under the Fourteenth Amendment, (3) breach of contract, (4) breach of the covenant of good faith and fair dealing, (5) promissory estoppel, and (6) negligence. The parties cross-motioned for summary judgment, and the district court granted summary judgment to the University on all claims. Regarding the Title IX claim, the district court concluded John had failed to establish the required causal connection between the investigation and anti-male bias. The district court likewise denied John's due process challenge for failure to state a claim and declined to exercise pendent jurisdiction over the state law claims.

John appeals on two grounds. First, he argues the record contains sufficient evidence to create a genuine dispute of material fact as to his Title IX claim. Second, he alleges the district court erred in failing to analyze his Title IX claim under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

## II. Analysis

John claims the University discriminated against him on the basis of sex during its sexual-misconduct investigation and its resulting decision to expel him

from the University.  We conclude a genuine dispute of material fact precludes summary judgment on this issue.

### A. Title IX Framework

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Where sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available.  *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  The parties agree the University receives federal funds and that John was excluded from participating in the University's educational programs by virtue of his expulsion.  The only issue is whether John has raised a genuine dispute about whether the University's investigation and decision to expel him was motivated by anti-male bias.  John alleges the district court erred in granting summary judgment to the University on his Title IX claim.

We review a district court's summary judgment order de novo, "applying the same standard that the district court is to apply."  *Singh*, 936 F.3d at 1037.  Where a Title IX plaintiff relies on indirect proof of discrimination, we apply the three-part burden-shifting framework announced in *McDonnell Douglas*.  *See McDonnell*, 411 U.S. at 792; *see also Hiatt v. Colorado Seminary*, 858 F.3d 1307,

1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies" to "Title IX sex discrimination claims.").[4]  "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence."  *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985).

Under this framework, John has the burden of showing that his sex was a motivating factor in the school's investigation and disciplinary decision.  *See Hiatt,* 858 F.3d at 1316.  If John clears that hurdle, then the burden shifts to the University to articulate a legitimate, nondiscriminatory reason for its decision. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  If the University does so, then the burden shifts back to John to show "a genuine issue of material fact as to whether the proffered reason is pretextual."  *Id.*  To prove pretext, John must produce evidence of "weaknesses, implausibilities,

---

[4]  The University correctly notes that we did not expressly invoke the *McDonnell Douglas* burden-shifting framework in a recent similar case against the University, *Doe v. University of Denver*, 952 F.3d 1182 (10th Cir. 2020) ("*Doe I*").  But the appellant in *Doe I* did not argue—as John has here—that the district court erred in failing to apply that framework.  This court has unequivocally held "[t]he *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims." *Hiatt*, 858 F.3d at 1315 n.8; *see also Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.").  In *Doe I*, we effectively found that the appellant had failed *McDonnell Douglas* at step three by failing to show that the school's "anti-respondent, not anti-male" explanation was pretextual.

inconsistencies, incoherencies, or contradictions in the [University's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [University] did not act for the asserted nondiscriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Title IX "bars the imposition of university discipline where [sex] is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). John and the University frame their arguments under the analytical framework set forth in a number of higher education Title IX misconduct cases. *See, e.g., id.* This framework recognizes two theories of Title IX liability: "erroneous outcome" and "selective enforcement." *Id.*; *see also Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (recognizing "erroneous outcome" and "selective enforcement" theories of liability); *Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (same); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (same); *Doe v. Valencia College*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("erroneous outcome" only).

Under the "erroneous outcome" test, a plaintiff must set forth "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "a particularized causal connection between the

flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715. To satisfy the "selective enforcement" test, a plaintiff "must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Univ. of Dayton*, 766 F. App'x. 275, 284 (6th Cir. 2019).[5]

Other courts have declined to superimpose these analytical tests onto Title IX, concluding that "[a]ll of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019); *accord Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *see also Sheppard v. Visitors of Virginia State Univ.*, 993 F. 3d 230, 236 (4th Cir. 2021); *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020). Instead, they "ask the question more directly: do the facts alleged, if true, raise a plausible inference that the university discriminated against [the student] 'on the basis of sex'?" *Purdue*, 928 F.3d at 667–68.

We think the latter approach better accords with the text and analytical framework of Title IX. But we recognize that evidence of an erroneous outcome

_____

[5] Some circuits recognize two additional theories of Title IX liability: "deliberate indifference" and "archaic assumptions." *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).

-15-

or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision. Because *Purdue* articulated the motion to dismiss standard, we reframe the operative question for summary judgment and ask: Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?

### B. Application

John claims the University's sexual-assault investigation against him was tainted by anti-male bias to such a degree that it is reasonable to infer sex was a motivating factor in the University's expulsion decision. The district court, in contrast, concluded the University's policies and actions were, at most, pro-sexual-assault *complainant*, rather than pro-female, and anti-sexual-assault *respondent*, rather than anti-male. Shortly after the district court's summary judgment order in this case, we decided a factually similar case, *Doe I*, on the same grounds—namely, that the plaintiff's evidence merely demonstrated anti-respondent bias, not anti-male bias. *See generally Doe I*, 952 F.3d 1182 (10th Cir. 2020). "[E]vidence of a school's anti-respondent bias," we explained, "does not create a reasonable inference of anti-male bias," because both males and females can be respondents. *Id.* at 1196.

*Doe I*, to be sure, covers much the same ground as this case. For example, as in *Doe I*, John here details how University employees faced considerable external pressure to pursue female claims of sexual assault. Most notably, he highlights that the University was the subject of two investigations by the Department of Education's Office of Civil Rights relating to its handling of sexual-assault claims. This caused the University to engage a consulting firm to audit the University's compliance with Title IX and implement new procedures. These new procedures were described in University training materials as a move away from "focusing on protecting the rights of the accused." App. 309. Moreover, like the plaintiff in *Doe I*, John highlights the statistical disparity in the gender makeup of sexual-assault complainants and respondents at the University.[6]

In *Doe I*, we held that this type of generalized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden "unless combined with a particularized something more . . . that would indicate that DU's decision in his particular case was based on his gender." 952 F.3d at 1192–93; *see also, e.g.*, *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular

---

[6] This is just an example of the overlapping evidence in these cases; there are others we need not address in detail.

-17-

case.  Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in John's specific proceeding, gives rise to a plausible claim.").  John argues the procedural deficiencies in his sexual-assault investigation, combined with additional statistical evidence of sex bias, distinguish this case from *Doe I*.  We agree.

### 1. Application of **McDonnell Douglas**

Applying the *McDonnell Douglas* framework, we conclude John has raised a reasonable inference that the University's one-sided investigation establishes a prima facie case of sex discrimination.  In other words, John has sufficiently shown evidence of differential conduct that plausibly was on the basis of his sex. *See, e.g.*, *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex."); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear procedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast . . . doubt on the accuracy of the disciplinary proceeding's outcome."); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding a "dubious [disciplinary] decision . . . taken against the

backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" supports "an inference that a university is biased based on sex.").

In response to John's showing of a prima facie case, the University posits a legitimate, non-discriminatory reason for its conduct: the University employees were biased against sexual-misconduct *respondents*, regardless of their sex. If true, this type of explanation—though at odds with general notions of due process—would not expose the University to Title IX liability, because respondent and complainant are (at least in the abstract) sex-neutral classifications.

Given this showing, under *McDonnell Douglas*, we assess whether John has produced enough evidence to raise an inference that the University's proffered explanation is pretextual—that is, covering up sex-based discrimination. We conclude that John has satisfied his burden.

### a. The University's Investigation

First, John claims that pretext can be shown because the University's investigation was replete with procedural deficiencies, all of which favored Jane and disfavored him, despite substantial reasons to discount her allegations. In the Title VII context, we have held that "disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's

proffered nondiscriminatory business reason is pretextual." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007). That logic naturally extends to this context, as "[s]uch irregularities can be sufficient to call into question the [University]'s honesty and good faith in making the [disciplinary] decision and, consequently, establish pretext." *Bird v. W. Valley City*, 832 F.3d 1188, 1203 (10th Cir. 2016) (discussing procedural irregularities in the context of adverse employment actions).[7]

Here, John points out that investigators interviewed eleven witnesses proposed by Jane but initially refused to interview all five witnesses proffered by John. At the urging of John, investigators ultimately agreed to interview John's psychologist, Dr. Bricker, and amended their report to include her statement. Yet, in that amended report, investigators explained that they could not consider most of Dr. Bricker's statements because they were "character testimony" and "expert opinion." App. 491.[8] The male students John asked to be interviewed—his

---

[7] In *Doe I*, we held the procedural irregularities in that case were not enough to show pretext and thereby satisfy *McDonnell Douglas* without "something more" to show that a school's decision results from sex bias. 952 F.3d at 1195. But "disturbing procedural irregularities" can certainly lower the threshold for how much additional evidence of sex bias is needed to make a case worthy of a jury's time and consideration. *Cf. Oberlin Coll.*, 963 F.3d at 588 ("[W]hen the degree of doubt [in disciplinary proceeding's outcome] passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias.").

[8] Dr. Bricker's letter expressing concerns about the integrity of the

(continued...)

-20-

roommate and close friends—heard about the sexual encounter from John very shortly after it happened and had witnessed interactions between John and Jane in the hours surrounding the alleged assault. The investigators explained in their Final Report that they decided not to interview these witnesses "[d]ue to the duplicative nature of the information that [these] individuals were expected to provide" and because of "the obligation of the investigators to keep this matter as private as possible." *Id*. at 451. Yet the same could be said for Jane's eleven witnesses that investigators opted to interview.

Next, John contends the University credited Jane's allegations despite numerous inconsistencies in her story as told to friends or classmates. We agree the Final Report that the disciplinary committee reviewed before expelling John, when viewed in the light most favorable to John, can be construed as ignoring, downplaying, and misrepresenting inconsistencies in Jane's account of the alleged assault. In addition to Jane's conflicting accounts of the alleged assault, the

---

[8](...continued)
investigation was sent after the release of the Final Report and is thus not relevant to its conclusions. But her concerns about the investigatory process—including the fact that Dr. Bricker felt her interviewer "had made up her mind already" because the interviewer did not ask any questions, *id*, the interview summary's initial mischaracterization of Dr. Bricker's statements, and the length of time the investigation took—indicate that at least one witness felt the investigation was biased and unprofessional. This, too, suggests "disturbing procedural irregularities" that point toward a showing of pretext. *Timmerman*, 483 F.3d at 1122.

record reveals several examples of Jane making inconsistent statements about other matters to John, her classmates, and the investigators.

For example, the investigator's summary of the investigation indicated that six witnesses confirmed Jane told them the same version of events, but the record reveals that only three of Jane's eleven witnesses told that version of Jane's story.[9] *See* App. 745 (The University "admit[s]. . . three witnesses . . . were mistakenly cited as corroborating this fact."). Yet, the determination that six witnesses corroborated Jane's story was included in the Final Report submitted to the disciplinary committee.

Additionally, investigators found G.H.'s report extremely "compelling" because he was a "total stranger" with no incentive to lie, in whom Jane confided while "heavily intoxicated." *Id.* at 489–90. The report then states that Jane's "description of the event to [G.H.] aligns with her statement to investigators nearly two months later." *Id.* at 489. But G.H.'s statement differed from the statement Jane gave to the investigators. G.H. said Jane told him "[s]he woke up

---

[9] And these three statements contained additional inconsistencies. For example, Jane told a friend that on Friday night, the night before the alleged assault, she was "pretty drunk" and John was "somewhat sober" and "trying to get into [her dorm] room with her." App. 467. As many witnesses confirmed, Jane sought out John in his friends' room on Friday night and brought him back to her room—even after he initially refused to leave with her—and John was intoxicated to the point of sickness. [*See e.g.* App. 853, 474]

-22-

. . . and found [John] engaging in sexual intercourse with her." *Id.* 472. But Jane told investigators that she woke up and had a conversation with John before he began kissing her and disrobing.

In fact, as John points out, Jane told an array of inconsistent stories about the alleged incident. She told some people the assault happened on Friday night and others that it happened on Saturday morning. She told some people that she woke up to John fondling her, others that she woke up to him engaging in intercourse, and others still that the two agreed to have sex, but when she told him of some pain, he convinced her to continue. And none of the witness accounts completely align with the story she told investigators. The Final Report does not mention any of these inconsistencies.

Neither does the report discuss any of Jane's potential motives for making a false report. Jane admitted to investigators that she only reported the incident because she heard John had told some of their classmates about their sexual intercourse and she wanted "privacy and for him to stop talking about it." *Id*. at 628. Notably, on Saturday, the day of the alleged incident, Jane told multiple people that she and John had sexual intercourse without ever mentioning that it was non-consensual. It was not until later—after Jane saw John talking to another young woman at a party—that she began telling people the encounter was not consensual. One witness statement indicated Jane changed her tune because she

-23-

"was angry" after "it got around that [John] had been with" another woman "the same day he was with" Jane. *Id*. at 482. An investigator testified that she took account of the fact that Jane wanted to date John, but John did not want to date Jane—but this, too, was omitted from the Final Report.

Next, John claims the investigators refused to gather potentially exculpatory evidence from Jane's medical exam. As noted above, a complete SANE report includes "summaries by the SANE nurse, the attending physician, and the patient's written statement regarding the source of the injuries." *Id*. at 490. Jane refused to turn all of this information over and instead gave only a few pages from the report to investigators. These pages indicated that Jane had scratches and bruises, but there was no description of the likely date or cause of these injuries written by a medical professional. The investigators explained that they had no legal process to compel disclosure of the omitted pages and that the parts of the report they reviewed were consistent with physical resistance by Jane on Saturday morning.[10]

The Final Report put a lot of weight on these extracted SANE report pages. The report noted that while John's "version of the event has been unwavering," his version does not outweigh "the medical injuries to [Jane] detailed in the

---

[10] John points out Jane repeatedly stated that the bruises were from Friday night and that she could not recall how she got them.

SANE report." *Id*. at 86. But, as John contends, the record shows that most of

the injuries noted in the SANE report are inconsistent with Jane's account of the

alleged assault. The Final Report acknowledges Jane had chosen what pages of

the SANE report to provide and had omitted potentially important exculpatory

information—yet the report still concludes that "any speculation regarding what

might be found in those documents does not outweigh the concrete information in

the sections that have been provided to the Investigators." *Id*.[11]

In sum, we agree the University's investigation and treatment of John raises

a plausible inference that it discriminated against John on the basis of his sex.[12]

_____

[11] John also notes that Jane threatened him with a "gun with one bullet and perfect aim" and claims this statement constituted "relationship violence" under University policies. App. 482. In his view, the investigators' failure to investigate this potential act of relationship violence demonstrates a pattern of sex-biased decision-making. But John's own statement to investigators reflects his understanding that Jane was trying to communicate "she had the power" to file a report against him. *Id*. at 496.

[12] These procedural deficiencies in the University's investigation of Jane's complaint amplify those we considered in *Doe I*. There, we noted a slew of procedural irregularities that looked "like a railroading," including that the University "refused to follow leads that were potentially exculpatory[,] . . . fail[ed] to consider obvious motives Jane might have to lie[,] . . . disbelieved Plaintiff from the outset[,] . . . selectively determined which post-encounter evidence they would consider relevant[, and] disregard[ed] numerous inconsistencies in the versions of the story told by Jane and her friend." *Doe I*, 952 F.3d at 1202 n.18. The *Doe I* panel noted the "accumulation of irregularities all disfavoring the respondent" were "even more troubling when, as in the case of DU's investigatory model, the investigators committing such errors are also the finders of fact on the ultimate issue of whether the alleged sexual misconduct occurred." *Id.* But we concluded that the University's lopsided investigation did

(continued...)

-25-

### b. Other Complainants

John also points to evidence that the University treated males less favorably than females in investigating and disciplining allegations of sexual misconduct.

As a general rule, we and other courts have declined to infer anti-male bias from disparities in the gender makeup of sexual-misconduct complainants and sexual-misconduct respondents. *See, e.g.*, *Purdue*, 928 F.3d at 669. This is so because such disparities can "readily be explained by an array of alternative nondiscriminatory possibilities," *e.g.*, that male students commit more sexual assaults, that women are likelier to be the victims of those assaults, "or that female victims are likelier than male victims to report sexual assault." *See Doe I*, 952 F.3d at 1192–93. But John does not simply raise the disparity in the gender makeup of complainants and respondents. He also points to a number of other statistical anomalies that raise at least a fair inference of anti-male bias.

First, John highlights that the University failed to formally investigate any of the twenty-one sexual-misconduct complaints brought by men from 2016 to 2018. In contrast, during the same period, there were about 105 complaints

---

[12](...continued)
not raise an inference of anti-male bias in that case without *something more* to cast doubt on the University's proffered "anti-respondent, not anti-male" position. *Id.* at 1192–95. But unlike in *Doe I*, here we have a more egregious investigation and additional statistical evidence of the University's differential treatment of males and females.

brought by women, fourteen of which were formally investigated by the University.  Unlike the statistical discrepancies we addressed in *Doe I*—there, that between 2011 and 2016 thirty-five out of thirty-six sexual-assault respondents were male—these sex disparities are not "almost completely beyond the control of the school," 952 F.3d at 1194.  Rather, the University has control over which complaints it decides to formally investigate.

Moreover, from 2016 to 2018, the University received five complaints brought against a female.  Four of those complainants were male and one was female.  The University did not formally investigate the four male-initiated complaints but did investigate the female-initiated complaint.  University statistics also show that a female student found guilty of non-consensual "touching" was given a deferred suspension,[13] whereas a male student found guilty of non-consensual "touching/kissing" was fully suspended.  The University is correct that these two violations were described somewhat differently in the enforcement statistics chart.[14]  Still, we find it significant that the only male

---

[13]  "Deferred suspension" is something of a misnomer.  It is essentially a warning to a student that should he or she violate again, expulsion is likely.  Students who receive deferred suspensions are allowed to remain on campus and attend school.

[14]  From reading the chart, it is clear that these brief summaries do not adhere to uniform categories, nor are they entered with much precision.  Thus, it is entirely possible that the "touching" report could have involved kissing.

student to receive a "deferred suspension" during this period was found responsible for physical (rather than sexual) misconduct.

Unlike the statistics presented in *Doe I*, this evidence casts some doubt on the University's position that its practices were uniformly pro-complainant and anti-respondent. The University explains that it did not move forward with formal investigations in the cases filed by male students for any one of the following reasons: "(1) the complainant decided not to pursue an investigation; (2) the case was referred to a different Department; (3) there was insufficient information; (4) the case was screened out; [or] (5) there was an alternative resolution." Aple. Br. at 25. But all of these explanations should apply equally to female-initiated complaints. The University itself notes, "[e]ach of these [five] rationales for not proceeding with an investigation was also applicable in cases where a female student was the complainant." Aple. Br. at 25. Because "screening out," referral, or finding there is "insufficient information" to proceed with a case are highly discretionary decisions, the statistical sex disparity in the University's resolution of these complaints suggests anti-male bias could be influencing outcomes. Thus, this statistical evidence is the "something more" that *Doe I* suggests.

We realize we are dealing with very small sample sizes, but this merely reflects the reality that sexual-misconduct claims in higher education

overwhelmingly involve a female complainant and a male respondent. Title IX

plaintiffs challenging the outcome of a sexual-misconduct proceeding will rarely

have direct evidence or even strong circumstantial evidence sufficient to

overcome a school's "anti-respondent, not anti-male" argument. But here John

has marshaled enough evidence to satisfy his burden of showing that under

*McDonnell Douglas* that the University's explanations of its conduct were

pretextual.

In sum, viewing the evidence in the light most favorable to John, we are

satisfied that a reasonable jury could find that John's sex was a motivating factor

in the University's decision to expel him.[15] While a one-sided investigation,

standing alone, might only raise a reasonable inference of anti-complainant bias,

*Doe I,* 952 F.3d at 1203, where there is a one-sided investigation *plus* some

evidence that sex may have played a role in a school's disciplinary decision, it

should be up to a jury to determine whether the school's bias was based on a

protected trait or merely a non-protected trait that breaks down across gender

---

[15] The University claims John waived or forfeited roughly a dozen arguments made in his opening brief. Most of these do not affect our merits determination. One exception, however, is the University's claim that John forfeited arguments related to the University's sexual-misconduct enforcement statistics. While John points to different aspects of the University's enforcement statistics chart on appeal, he does not raise "bald-faced new issues." *See In re Rumsey Land Co., LLC*, 944 F.3d at 1271. Rather, as below, he uses the chart to argue the University has a history of discriminating against men in its sexual-assault investigations. John has not substantively changed his legal theory nor the evidence on which he relies.

lines.  John thus satisfies the requirements of the *McDonnell Douglas* test to overcome summary judgment.

## III.  Conclusion

For the foregoing reasons, we VACATE the district court's grant of summary judgment to the University and REMAND for further proceedings. Appellant's "Unopposed Motion for Leave to File Sealed Appendix" is GRANTED.